506 A.2d 438

**Armando BUCCI and Assunta Bucci, h/w**

v.

**Bernadette M. BUCCI, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 17, 1985.

Filed March 14, 1986.

458

George P. Wood, King of Prussia, for appellant.

Maurinc J. Rossanese, Jr., Conshohocken, for appellees.

Before BROSKY, McEWEN and HESTER, JJ.

HESTER, Judge:

Appellees, Armando and Assunta Bucci, filed a petition for visitation of their grandaughter, Nicole, in February, 1984. Following protracted proceedings, appellees were awarded visitation for two hours on the first Sundays in February, May, September and December. Appellant, Bernadette M. Bucci (now Szekeres), the natural mother of Nicole, filed this appeal from the visitation order. Following a review of the record, we hold that there was sufficient evidence that grandparent visitation was in the best interest of Nicole. Accordingly, we affirm.

Appellant and Franco Bucci, appellees' son, were married at the respective ages of seventeen and eighteen on September 22, 1979. Appellant gave birth to Nicole on December 19, 1979. Franco is not a party to these proceedings; he is serving a seven-year term of imprisonment for an arson conviction.

From the date of their marriage until March, 1980, appellant and Franco resided with appellees in Abington Township, Montgomery County, Pennsylvania. In January, 1980, appellant and Franco began to experience severe marital difficulties; they argued vehemently and Franco struck appellant on occasion causing her to file assault charges against him.

In March, 1980, Franco moved from appellees' house, and appellees suggested that appellant and Nicole return to her parents' house two blocks away. Appellant moved, but she and Nicole regularly visited appellees for the next month.

After April 6, 1980, appellees did not see Nicole until June, 1984, when the trial court ordered visitation while these proceedings were pending. Appellees visited Nicole on two subsequent court-ordered occasions before the order at issue was entered.

Whether the matter concerns custody or visitation, the primary issue is the best interest and permanent welfare of the child. *Commonwealth ex rel. Pierce v. Pierce*, 493 Pa. 292, 426 A.2d 555 (1981). It is in the child's best interest to preserve and nurture those relationships which are meaningful, while avoiding situations which might prove harmful. *Commonwealth ex rel. Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180 (1983).

The Custody and Grandparents Visitation Act, 23 P.S. § 1001 et seq., provides for grandparent visitation under several circumstances. In cases such as this where the parents' marriage has been dissolved,

> the court may, upon the request of the parent or grandparent of a party, grant reasonable visitation rights to the unmarried child, after dissolution of marriage, if it finds that visitation rights would be in the best interest of the child and would not interfere with the parent-child relationship. The court shall consider the amount of personal contact between the parents or grandparents of the party and the child prior to the application.

*Id.*, at § 1013.

Appellees had the burden of overcoming appellant's right to continuous custody. This burden is less than that in custody cases. For example, appellees did not have to prove that it was in Nicole's best interest for them to take custody of her. It was their burden to show only that it was in her best interest to give them some time with her. *Commonwealth ex rel. Miller v. Miller*, 329 Pa.Super. 248, 478 A.2d 451 (1984); *Commonwealth ex rel. Williams v. Miller*, 254 Pa.Super. 227, 385 A.2d 992 (1978).

In reviewing visitation orders, appellate courts are not bound by the trial court's deductions, inferences and

interpretations of evidence. We have the independent judgment to consider the merits and to provide an order that is both correct and just. *Suroviec v. Mitchell,* 347 Pa.Super. 399, 500 A.2d 894 (1985). Despite having this broad scope of appellate review, we are mindful that matters of credibility are solely for the trial court's judgment; only the trial judge can observe demeanor and assess trustworthiness. *Id., Commonwealth ex rel. Miller, supra.*

■ The first issue is whether the trial court failed to give proper weight to the "resentment, bitterness, hatred and dislike among the parties." Appellant points to the history of her tumultuous relationship with Franco and to the unpleasant court-ordered visitations. Much of appellant's presentation of the history conflicts with the trial judge's findings of fact. Those findings were largely the result of a credibility assessment, and upon our independent review of the merits, we hold that those findings are supported by the record.

From the time of their marriage in September, 1979, until January, 1980, appellant and Franco Bucci were reasonably compatible, and appellees' household operated harmoniously. During this period, appellant attended high school and worked as a part-time dental assistant with appellees' daughter. Franco and appellees also worked. Appellees and their daughter performed most of the domestic chores of washing clothing, cooking and cleaning the house so that appellant could advance her education, work and prepare for birth.

From September, 1979, until appellant left appellees' residence in March, 1980, appellees purchased infant clothing, a crib, bassinet, and infant bathtub; they provided a christening reception and routinely babysat, changed diapers and fed Nicole. These efforts reflected responsibility and a loving attitude toward Nicole.

Appellant emphasizes her tempestuous relationship with Franco which began in January, 1980. They frequently engaged in violent arguments and Franco occasionally

struck her. Appellant complains that appellees witnessed many of these arguments, and despite her pleas, they refused to counsel and temper their son. She also complains that appellees did not *suggest* that she leave in March, 1980; instead, they *demanded* that she leave because Franco had moved.

There was sufficient evidence that appellees rebuked both appellant and Franco for their arguments and advised them to resolve their differences. The trial court was apparently hesitant to hold appellees accountable for correcting their son's behavior; he was emancipated, married, a father and apparently uncontrollable. Appellees' decision not to take sides is not evidence of animosity directed to appellant.

Also, there was sufficient evidence that appellees recommended, not demanded, that appellant leave in March, 1980. Although Franco had moved, it was not prudent for appellant to remain in appellees' house. Appellant and Franco had been feuding severely for three months, and appellant's presence in appellees' house might provoke Franco to return to vent his anger. Franco was appellees' son, and there was no evidence that he was barred from the house; presumably, he could return upon impulse. Appellant could avoid chance meetings with Franco and live more safely in her parents' house. Suggesting that appellant leave was a responsible and compassionate act; it was not a harsh act as appellant suggests.

As further support for her contention that there was unyielding animosity caused by appellees, appellant emphasizes that appellees did not visit Nicole or acknowledge her birthdays and holidays from April, 1980, until June, 1984. She also alleges that court-ordered visitation in June, August and November, 1984, resulted in quarrels and bitter accusations.

Appellees testified that they continued to see appellant and Nicole nearly every day for one month after they left in March, 1980. These visits were amicable until April 6, 1980, Easter Sunday. Appellant and Nicole were dinner guests that day when Franco barged in and expressed his distaste

for appellant's presence in his parents' house. A verbal and physical fight ensued that culminated in Franco pulling appellant's hair. Appellees called the police to settle the altercation. Appellant would not return to appellees' house because she blamed them for not aiding her when Franco pulled her hair.

Appellees' decision to call the police was reasonable considering Franco's violent behavior. The police arrived, separated Franco from the others and spoke at length with him until he composed himself. Appellees acted effectively; they terminated the altercation and saved appellant from incurring serious injury. To blame them for not taking her side ignores the effective solution which they selected. Certainly, their actions did not contribute to the animosity that developed.

It is true that appellees did not attempt to visit, call or write appellant or Nicole from April, 1980, until November, 1980. They feared that Franco would complain again should he discover that they were visiting appellant and Nicole.

By April, 1980, Franco had become insufferable, and his relationship with appellant was tenuous. From February, 1980, to June, 1980, appellant had instituted three separate criminal actions against Franco. In February, Franco pled guilty to assault and battery. He also pled guilty in May to flattening the tires of appellant's parents' automobile and the tires of a police vehicle summoned to the scene. Finally, he was found guilty in June, 1980, of throwing a bottle through a window, narrowly missing appellant and Nicole. Franco was incarcerated three months for this third offense. As the altercations between Franco and appellant were extremely severe, appellees had good cause for not contacting appellant and Nicole for fear of upsetting a fragile respite.

In November, 1980, appellees were told that appellant had moved. Whether she actually moved at that time was disputed; nevertheless, it was undisputed that appellant, Nicole and her parents moved no later than June, 1981, to

an address unknown to appellees until they retained counsel in January, 1984. For approximately three years, appellees attempted to send gifts and to discover appellant's whereabouts, but they were unsuccessful. We acknowledge that appellees' efforts were not extreme; however, it cannot be inferred that this four-year hiatus was the result of their animosity toward appellant or abandonment of Nicole.

As additional evidence of the animosity allegedly caused by appellees, appellant directs us to the three court-ordered visits by appellees with Nicole. The first visit occurred on June 24, 1984, when appellees were permitted to visit Nicole for two hours at the house of appellant's parents. According to appellant, Nicole clung to her and cried, and appellee Assunta Bucci called appellant a liar for accusing Franco of throwing the bottle through a window.

During the second visit on August 26, 1984, Assunta Bucci allegedly renewed her attack on appellant's integrity and accused her of corrupting Franco. Finally, appellant complains that on November 11, 1984, Nicole refused to see appellees and appellees departed after waiting for Nicole for just four minutes.

Once again, we defer to the judgment of the trial court that appellant was solely accountable for the strife during these visits. Certainly, at the very least, appellant did not recognize the rights of grandparents generally and did not counsel Nicole concerning appellees' identity and the paternal relationship she had with them.

We are not surprised by the unpleasant atmosphere during the three court-ordered visits in 1984. First, appellees had not seen Nicole for four years. Nicole was six months old when she last saw appellees, and it would be natural for her to forget appellees and appear disinterested during the 1984 visits. This is particularly so since appellant was not encouraging Nicole to remember her paternal grandparents. There was sufficient evidence from the visits themselves to support the trial court's finding that appellant, her parents and new husband caused much of the friction. During the June, 1984 visit, appellees testified that the child they

visited was not Nicole. They remembered Nicole as having dark hair whereas the child presented to them had blond hair. Also, appellees were forbidden by appellant's father to bring gifts, and they were instructed to sit in designated chairs.

During the second visit, appellant instructed Nicole to shoot a water pistol at appellees because they were "bad" people. Nicole did not appear for the third visit in November, 1984, because appellant's husband refused to summon her. Moreover, there was evidence that appellees waited ten minutes for her, all the while attempting to gain the cooperation of appellant's husband.

Considering the four-year hiatus between visits and the behavior of appellant and her family, appellees cannot be held accountable for the unpleasant visits.

Appellant cites *Zaffarano v. Genaro, supra,* and *Wick v. Wick,* 266 Pa.Super. 104, 403 A.2d 115 (1979), as two cases where the courts denied custody and visitation to grandparents because hostilities were insurmountable. Each of these cases is distinguishable from the facts sub judice. In *Zaffarano,* the maternal grandparents petitioned for temporary custody rights to their grandchild. The father offered to allow the grandparents to visit with his daughter in his presence; however, they declined. Unlike appellees here, the *Zaffarano* petitioners had the heavier burden of proving that it was in their grandchild's best interest to have custody of her away from her father.

Furthermore, in *Zaffarano,* one grandparent admitted blaming the father for the death of the mother, the petitioners' daughter, and stating that he was not a "good husband, father or provider." The petitioners' other daughter admitted berating the father for not spending more time with the child.

Here, we have no admissions by appellees that they accused appellant of neglect or slovenly child care. Nor did they admit engaging in violent arguments with appellant.

In fact, they repeatedly testified that they respected appellant for her care of Nicole.

The *Zaffarano* petitioners contributed significantly to the animosity between them and their son-in-law. There was also evidence of the son-in-law's hostility. Under those circumstances, the court denied partial custody because it was reluctant to place the child between two parties who regularly exchanged barbs.

Here, the trial court made a credibility assessment that appellant created the animosity. Since appellees do not retaliate, there is the possibility that their more temperate behavior may prevail and the animosity may wane. Certainly, while they are with Nicole, they will not disrupt the visits and subject her to a crossfire of accusations.

*Wick* is equally distinguishable. The primary distinction is that *Wick* pre-dated the Custody and Grandparent's Visitation Act, and there was no other authority establishing the rights of grandparents to visit with a child. Moreover, the parties declined to present any testimony concerning the extent and cause of animosity.

The second issue we must address is whether the court erred in disregarding the four-year period during which appellees did not see or communicate with Nicole. The court did consider this period, and it appears that it was the crux of the proceedings. It was discussed above as we addressed appellant's contention that the four years was evidence of appellees' animosity. We add two important notes: appellant and Nicole have been free to visit appellees since November, 1980, and the four-year hiatus is not alone grounds that renewed visitation is against Nicole's best interest.

The third issue is whether the trial court improperly labeled its order one of visitation when in actuality it was a partial custody order. The Custody and Grandparent's Visitation Act allows grandparent visitation only. Appellant argues that the court violated the act by ordering

partial custody as evidenced by the permission granted appellees to remove Nicole from appellant's house.

■ The distinguishing factors between visitation and partial custody are the length, frequency, and place of visits and who has effective control of the child during the visits. *Note, Visitation Rights of a Grandparent Over the Objection of a Parent; The Best Interest of the Child,* 15 J.Fam.L. 51 (1976–1977). As discussed earlier, appellees were awarded visitation on four Sundays annually, each visit to occur for two hours. Because of the infrequency and short duration of the four annual visits, the order must be considered one for visitation.

■ We acknowledge that appellees had the option of removing Nicole from appellant's house. That alone does not mandate a holding of partial custody, particularly where appellant has the option to accompany Nicole and to maintain control. Removal from appellant's house was justified considering the unpleasant earlier visits inside the house. Less time with Nicole is hardly possible; therefore, it would strain reason to consider the order to be one of partial custody. For these reasons, we hold that the order was indeed for visitation.

Order affirmed.