601 A.2d 352

## Catherine M. ANDREWS

v.

## Perry C. ANDREWS, III, Appellant.

Superior Court of Pennsylvania.

Argued Aug. 1, 1991.

Decided Nov. 26, 1991.

Reargument Denied Jan. 31, 1992.

288

Kathleen Dautrich, Reading, for appellant.

Sandra Edwards Gray, Lancaster, for appellee.

Before MONTEMURO, TAMILIA and BROSKY, JJ.

MONTEMURO, Judge:

This is an appeal from an order vesting sole legal custody of the parties' minor child in appellee, and reducing appellant's joint physical custody of the child to a lesser, partial custody schedule.

The parties were married in May of 1980, and in January of 1987 the child, Kelsey, was born. At separation in September of 1989, appellee removed herself and the child from the marital home, and in December of 1989, appellee filed for divorce, including in her complaint a count requesting custody. In March of 1990, after hearings, the Master[1]

---

1. The trial court's Opinion states that the Master's hearing was held "pursuant to Berks County Rules of Court." Pa.R.C.P. 1920.-

recommended that the parties share physical and legal custody of the child. A schedule adhering to this recommendation was adopted until hearings on appellee's exceptions to the Master's report were held in July and August of 1990. According to this arrangement, appellant received the child on Mondays, and Tuesdays, alternating Wednesdays and weekends with appellee. In October 1990, the order granting appellee primary physical and legal custody was entered, restricting appellant's periods of custody to three hours Wednesday evening, and alternate weekends and holidays. This appeal followed.

■ There is no disagreement between the parties that the primary consideration in custody disputes is the best interests of the child.[2] Rather, the controversy revolves around wherein the child's best interests lie. In order to make such a determination, "It is clear that a custody court has an obligation to consider *all relevant factors* that could affect the child's well being," *DeNillo v. DeNillo*, 369 Pa.Super. 363, 367, 535 A.2d 200, 202 (1987) (emphasis added). Our task is to assess the trial court's performance in light of this paramount concern.

In reviewing a custody order, we are not bound by findings of fact made by the trial court which are unsupported by the record, nor are we bound by the court's inferences drawn from the facts. *Commonwealth ex rel Spriggs v. Carson*, 470 Pa. 290, 294–95, 368 A.2d 635, 637 (1977). However, on issues of credibility and weight of the evidence, we defer to the findings of the trial judge,

51(a)(2)(iii), consistent with the Divorce Code, 23 Pa.C.S.A. § 3321, prohibits the appointment of a Master to hear testimony on issues of custody or paternity. We merely note the problem, as neither party has objected to this method of proceeding.

2. Despite the parties' agreement on this point, the Dissent would subordinate the child's best interests to "fundamental rights and fair play." (Dissenting Opinion at 298). However, the law clearly places the child's best interests above all other considerations, *see, Commonwealth ex rel Robinson v. Robinson*, 505 Pa. 226, 478 A.2d 800 (1984), including what the Dissent terms without definition, "superior rights." The only superior rights recognized by current jurisprudence are those of the child.

who has the opportunity to observe the proceedings and the demeanor of the witnesses. *Id.,* 470 Pa. at 295, 368 A.2d at 637. Only where we find that the custody order is "manifestly unreasonable as shown by the evidence of the record ..." will an appellate court interfere with the trial court's determination. *Murphey v. Hatala,* 350 Pa.Super. 433, 439, 504 A.2d 917, 920 (1986), *appeal denied,* 516 Pa. 634, 533 A.2d 93 (1987), citing *Mielcuszny v. Rosol,* 317 Pa. 91, 176 A. 236 (1934); *Commonwealth ex rel Berman v. Berman,* 289 Pa.Super. 91, 432 A.2d 1066 (1981). Therefore, unless the trial court's ruling represents a gross abuse of discretion, we will not interfere with an order awarding custody. *Commonwealth ex rel Rainford v. Cirillo,* 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972), quoted in *Lombardo v. Lombardo,* 515 Pa. 139, 148, 527 A.2d 525, 529 (1987).

*Mumma v. Mumma,* 380 Pa.Super. 18, 21, 550 A.2d 1341, 1343 (1988). *See also, Karis v. Karis,* 518 Pa. 601, 544 A.2d 1328 (1988); *Commonwealth ex rel Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984).

■ Appellant has presented us, at least ostensibly, with ten claims, many containing subissues. However, they all, by and large convey the same assertion,[3] that the trial court, in various respects, abused its discretion by drawing conclusions which were contradicted or unsupported by the evidence, or by misapplication of the law.[4]

■ The theory central to the trial court's finding as to the inappropriateness of joint custody is that certain unilateral actions taken by appellant were manipulative and de-

3. The one exception, which challenges the court's exclusion of evidence concerning appellee's paramour, will be dealt with separately.

4. We note with disapproval that appellant's Statement of Questions Presented, which covers three full pages of his brief, is violative of Pa.R.App.P. 2116(a), which provides that the Statement "should not ordinarily exceed 15 lines" and "must never exceed one page." Moreover, in further violation, the material contained in the Statement is verbose, repetitive, and argumentative, includes dates and other particulars specifically prohibited by the Rule, and fails to include the answer of the trial court to each of appellant's claims, which are, rather than questions, declarative sentences.

signed to place him in a more advantageous position with regard to the litigation rather than to further his child's best interests. Specifically, without notifying appellee, and in contradiction to appellee's wishes, appellant placed Kelsey in a daycare facility during the days in which she was in his custody. Moreover, appellant had the child enrolled in speech therapy upon the advice of a physician other than her treating pediatrician, also against appellee's wishes, and without her knowledge. Finally, the trial court finds negative connotations in the fact that appellant undertook to toilet train Kelsey, who had been resistant to appellee's efforts in that direction, and failed to apprise appellee of his success. The trial court concludes that these measures were detrimental to Kelsey, and on that basis dissolved the joint custody arrangement, depriving appellant of any part in decisions regarding Kelsey's welfare.

We find that the trial court's major premise is unsupported by the record, and that as to the putative damage wrought upon the child by appellant's intervention, the trial court misinterpreted the evidence on which this conclusion is based.

■ The guidelines for determining the propriety of a shared custody arrangement were enunciated by this court in *In re Wesley J.K.*, 299 Pa.Super. 504, 445 A.2d 1243 (1982). The criteria established were that 1) both parents must be "fit," that is, "sane and capable of making rational child rearing decisions, . . . willing and able to provide love and care for their children," *Id.*, 299 Pa.Superior Ct. at 515, 445 A.2d at 1248; 2) both parents must evidence a continuing desire for active involvement in the child's life; 3) both parents must be recognized by the child as sources of security and love; 4) a minimal degree of cooperation between the parents must be possible. *Id.* In the trial court's estimation, this last criterion is seen as the insurmountable obstacle to a shared custody arrangement.[5]

**5.** The trial court, although accepting the expert's assessment of both parties as lacking psychiatric pathology, does insist upon the description of appellant as a rigid and angry personality as the source of all

In having Kelsey tested for speech developmental problems and enrolled in speech therapy, the situation which appellant unilaterally moved to correct involved a three and a half year old whose verbal ability, according to the expert who performed the testing, and whose qualifications were not contested by appellee, had progressed no further than that of a child less than two years old. Kelsey was unable even to say her own name, and could articulate no more than two short words in succession.[6] Those words she could say were difficult to understand. The expert testified that a problem such as the one Kelsey presented could cause difficulties in interaction with other children, resulting in ostracism or ridicule, hence the prescription that therapy be instituted as early as possible. Moreover, the expert testified that a standard recommendation for children in speech therapy is enrollment in some sort of preschool or development center to enable them "to observe the language skills they should be achieving ... and to imitate the language skills in a nonpressure situation." (N.T. 7–12–90 at 204).

When retested after two months of therapy, Kelsey's speech showed a marked improvement, one noted by appel-

difficulties here. It goes further, and suggests that appellant alone is in need of psychological counseling. These findings have no evidentiary support in the record.

**6.** The trial court notes in one instance, speaking of the testimony of the psychologist appointed by the court to evaluate the parties, that there was testimony concerning Kelsey's inability "to articulate what her emotional home base was." (T.C.O. at 19) It was implied that this inability was the result of confusion stemming from her parent's animosity. However, the record reveals that the expert chose not to force a choice due to Kelsey's age, and her inability to articulate.

In another instance the trial court states that appellant's anger toward appellee led to his enrollment of the child in speech therapy, and that he tacitly encouraged her to hide her activities from her mother, stating that Kelsey "is bright enough to have known that she was not to discuss Dr. Hanna [the referring physician] or the Reading Rehabilitation Hospital [where the therapy sessions occurred] with her mother." (T.C.O. at 25) Such a statement is ludicrous in view of Kelsey's limited verbal abilities.

lee [7] (*Id.* at 90 at 105), and by Mrs. Pennypacker, the child's grandmother, and a major contributor to Kelsey's care. (*Id.* at 126) Despite appellee's lack of involvement in the initiation of therapy, both parties agreed to Kelsey's continuation in the program, primarily because of its evident benefits. Moreover, the trial court directed that following the hearing, Kelsey be retested, and specified both the analyst and the venue of reevaluation. The conclusions drawn by this expert mirrored exactly those measures undertaken by appellant, and recommended continuation of the program already begun. (See, Speech–Language Evaluation Report of 7–27–90 performed by Jane F. Meyers, M.S., at 4.) [8] It is difficult for this court to accept, in view of this improvement and of appellee's acquiescence in the treatment,[9] that appellant's actions can be viewed only as measures designed to improve his position in litigation, or as a means of avenging himself on appellee. The trial court acknowledged appellant's testimony that he failed to inform appellee of Kelsey's enrollment in speech therapy because he believed appellee would be angry if she found out and, in

7. It is noted by the trial court that appellee never obtained a second opinion of Kelsey's language development from a speech therapist, but rather discussed the matter with a member of the Albright College Speech Therapy Department. (T.C.O. at 8) In fact appellee mailed a copy of the evaluation obtained by appellant not to a speech pathologist, but, at the suggestion of the pediatrician, to a person identified as the accounting director of the psychological services center at the college. (N.T. 7–12–90 at 98) It is to this pediatrician, who admitted that he had not the expertise even to interpret the report of the speech therapist, that the Dissent points as an adequate assessor of Kelsey's condition.

8. Without providing authority for its conclusions either from the record or elsewhere, the Dissent has decided that proceeding with speech therapy for a child of three is subject to serious question, as is such therapy without the involvement of both parents. Nothing in the reports of either expert, or indeed in the testimony of any witness is supportive of this view.

9. Even the Dissent notes that in acquiescing to the measures taken with Kelsey, appellee, "placed the child's best interest above her personal feelings." (Dissenting Opinion at 299) This seems to indicate not only appellee's obstructiveness in the face of any suggestion made by appellant, but also that the results achieved were not, as the Dissent would have it, merely conjectural.

fact, she was angry when he told her. Despite this explanation, the court nevertheless concluded that appellant's behavior was somehow motivated solely out of his hostility and bitterness toward appellee.

The daycare situation [10] is similar in its implications. At the suggestion of Dr. Hanna, the referring physician for speech therapy, appellant enrolled Kelsey in a daycare center two to three days a week to assist with the speech problem and to provide the child social interaction with and opportunities to observe children her own age. Up until this point, Kelsey spent most of her time in the company of adults. Although appellant initially failed to inform appellee that Kelsey was attending the daycare center because appellee was opposed to the idea, appellee agreed to the continuation of Kelsey's attendance at the preschool, given the rapid improvement in Kelsey's speech and the speech pathologist's recommendation of Kelsey's continued enrollment in the program. The daycare placement, like the speech therapy, was regarded by appellee as having a positive result (N.T. 7–12–90 at 67), and one which she would possibly have agreed to had she been consulted (*Id.* at 63). Moreover, appellee stated that she intended to continue Kelsey's enrollment under the then present schedule, that is, two or three half-days per week. (*Id.* at 70)

■ The final outrage, as the trial court sees it, is appellant's success in toilet training the child and his failure to apprise appellee of the child's progress. It is to this derelic-

10. The trial court, in support of its position that day care is detrimental to the child's best interests, points to the testimony of Kelsey's treating pediatrician, who stated that

"a ten hour day at the day care center for a child of Kelsey's years was pretty ambitious. He noted that public school kindergarten is usually a morning or an afternoon session for children who are 5 or 6 years old and Kelsey has not yet reached 4 years old." (T.C.O. at 4)

Leaving aside the accuracy of the pronouncement as to public schools, Kelsey's schedule at the daycare center consists of half-days on Mondays, Tuesdays, and alternate Wednesdays, a regime entirely consistent with the pediatrician's views despite the Dissent's attempt to demonstrate the opposite.

tion that the court attributes the confusion the child was said by the examining psychologist to evidence. We would first note that despite the confusion, whether or not it stems from the parties' differing ability to accomplish anything in this area, the court's expert was clear that Kelsey was a normal, basically healthy child (N.T. 8–23–90 at 12), an assessment shared by appellee (N.T. 7–12–90 at 54), and the child's grandmother (*Id.* at 114, 118). The confusion, which the trial court implies was due to appellant's subversion of appellee's efforts, was attributed by the expert to the very different styles evidenced by the parties in managing the child. However, there was testimony to the effect that the same result could occur in intact families with the same personality differences. (N.T. 8–23–90 at 52) [11] Despite these differences, and the animus demonstrated by the parties toward each other, shared legal custody was recommended by the court's chosen expert in this case because both parties were seen as rational and intelligent (*Id.* at 21), and the continuation of shared physical custody was seen as important for continuity and consistency. (*Id.* at 73) [12] Nowhere in the record was there evidence that appellant was systematically attempting to "destroy the Mother/Child relationship by his unilateral acts." (T.C.O. at 25)

Given the advancements made by Kelsey due to appellant's involvement of professional help, we must disagree with the trial court that appellant's actions regarding speech therapy, daycare and toilet training derived from appellant's anger and hostility and were merely "manipulation[s] of a child through a pattern of secrets," (T.C.O. at 21), and that they are causing harm to the child. On the contrary, these activities were instituted in view of the

**11.** The Dissent finds this diversity unequivocally negative. However, mere diversity of personality type by itself, is not and has never been the basis on which to determine custody.

**12.** The question of appellant's right of first refusal, that is his ability to keep Kelsey when appellee is unavailable, was, as the Dissent notes, found by the expert to have an undesirable effect on Kelsey's sense of permanency. We see no reason to differ.

child's best interests.[13] The court's conclusions both as to appellant's motives, and the resultant deleterious effect upon the child are simply preposterous and unsupported by the record.[14]

Further, we find that the trial court erred in attributing the lack of cooperation between the parties to appellant alone. Appellant initially sought appellee's agreement to enroll Kelsey in the preschool, but appellee, after participating in the initial preplacement interview, (N.T. 7–12–90 at 88) absolutely refused to give her approval. Appellant therefore kept Kelsey's involvement in these beneficial activities a secret from appellee because appellee would not have allowed them to take place. From our reading of the record, appellee, rather than appellant, was less than cooperative in promoting Kelsey's best interests. The child undoubtedly needed professional help in an area which appellee herself recognized as requiring medical intervention (*Id.* at 104), yet appellee remained adamant in her position that Kelsey had no problem necessitating such attention. Appellee only acquiesced in Kelsey's continued enrollment in speech therapy and daycare after someone else had taken the initiative in seeking help, and the help had proven beneficial. We do not believe that appellant should be "punished" for his concern over the child's welfare by depriving him of joint custody of Kelsey, particular-

13. The Dissent notes that even assuming the benefit to the child accruing from appellant's actions, "this does not mean this child's future is going to be a happy and productive one." (Dissenting Opinion at 358). Unfortunately no court, nor any other human agency, can or should attempt to stand as guarantor of what is to come. However, the attempt can and must be made, through case disposition, to assure that those things are done which will provide a child with the best possible opportunities to thrive and develop normally, that is, those things which are in the child's best interests.

14. In its opinion, the court states, "The unilateral actions of the Defendant ... evidence his inability to act in a cooperating manner about Kelsey." (T.C.O. at 21) If we were to accept this conclusion, then any action on the part of appellant which appellee does not approve, regardless of how necessary or beneficial to Kelsey, would be interpreted as uncooperative by the court and therefore warrant revocation of his joint custody rights. The absurdity of such a result is obvious.

ly where his activities were of demonstrable and acknowledged benefit.[15]

In this instance, the trial court would have been better advised to continue the schedule to which the child had become, in appellee's own words, very well adjusted (*Id.* at 54) and which the court appointed experts recommended be continued, and to order the parties to share the decision-making process. That they are capable of such cooperation is clear from the occurrences subsequent to appellant's actions.

■ Finally, appellant complains that the trial court erred in excluding all evidence concerning appellee's paramour, one Luke Whitman, who, according to the testimony of both appellee and her mother spends nearly every evening between approximately 6 p.m. and 11 p.m. at appellee's residence, and accompanies appellee and Kelsey on family outings. (*Id.* at 77, 122) The child also calls this person "Luke-daddy," although appellee testified that she did not tell Kelsey to use this form of address.[16] In *Bucci v. Bucci*, 351 Pa.Super. 457, 506 A.2d 438 (1986), we stated that where inquiry is being made into the child's best interests for purposes of custody determinations, "It is in the child's best interest to preserve and nurture those relationships which are meaningful, while avoiding situations which might prove harmful." *Id.*, 351 Pa.Superior Ct. at 460, 506 A.2d 439. As this individual clearly spends a significant amount of time in Kelsey's presence, his effect upon her is a factor in determining the award of custody herein. As we

15. The result in this case is characterized by the Dissent as "inform[ing] the domestic relations legal community that to win a shared custody award, one need only unilaterally and secretively engage in practices and programs which may appear to have some benefit to the child." (Dissenting Opinion at 300) This pronouncement not only distorts the factual realities involved here, but ignores the reasoning behind the conclusion. Disagreement with the outcome in a given instance should engender a reasoned, logical response. Nothing else is necessary or productive.

16. The trial court's statement to the effect that appellee indicated this manner of address was strongly discouraged is not supported by the record. (See, N.T. 7–12–90 at 77, 123)

have already stated, the court is obligated to consider "all relevant factors" *DeNillo v. DeNillo, supra,* in making its decision. Clearly, the character and habits of a man with whom Kelsey has almost daily contact in her own home bear upon whether proximity to this person is in the child's best interests. The trial court, in finding such information irrelevant, and a psychological evaluation unnecessary erred.

For the foregoing reasons, we reverse the custody order and remand for proceedings consistent with this memorandum.

Reversed and remanded. Jurisdiction relinquished.

TAMILIA, Justice, concurring and dissenting:

I dissent to the holding of the majority which reversed the decision of the trial judge because I believe it ignores the importance of giving great weight to the trial judge's findings unless there has been a substantial abuse of discretion. The central focus of this trial and holding is the best interest of the child as it relates to the wisdom or propriety of retaining a shared custody arrangement. Assuming, without accepting, the interpretation of the majority that the child benefits from the unilateral actions of the father, it still does not necessarily follow that shared custody is the appropriate award in this case. Best interest does not always relate to immediate improvements in the child's condition and the courts have never been reluctant to subject best interest to a higher requirement that in the process, fundamental rights and fair play not be sacrificed to apparent best interest.

A few examples of the subjection of best interest to a prior mandate of superior rights is illustrated in the following cases. In *In re Rinker,* 180 Pa.Super. 143, 117 A.2d 780 (1955), and *In re Rose,* 161 Pa.Super. 204, 54 A.2d 297 (1947), this Court declared that the best interest of the child did not permit the state to take children from the poor and place them with the rich despite the improvement in their condition that would result. The Juvenile Act has carved out this precept in determining a need to establish first,

neglect or deprivation, and secondly, a clear necessity to remove the child before the court may consider best interest. *See Rose, supra; In interest of LaRue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976). In recent times, the United States Supreme Court has ruled that despite a trial court finding that a child would suffer by living in a black community with his white mother and black stepfather, racially based concerns cannot be considered in determining what is in the best interest of the child. *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). In *Burke v. Pope,* 366 Pa.Super. 488, 531 A.2d 782 (1987), we held the custodian, who was not the natural mother, despite bonding with the children and caring for them for several years, could not defeat the right of the mother to assume custody. Best interest does not always appertain to immediate better treatment and care when viewed with relation to the permanent welfare of the child. It likewise cannot be argued that a parent who becomes a self-appointed custodian through child snatching automatically acquires preferential rights by isolating and alienating the child from the other parent, no matter how well the child appears to do under the meretricious arrangement. The entire Uniform Child Custody Jurisdiction Act, 23 Pa.C.S. § 5341 *et seq.,* is directed at preventing this insidious and usually vicious practice. In essence, the law and the courts should not reward parents who unilaterally and willfully conduct themselves in such a manner that the other parent is deprived of the opportunity to be involved in the parenting process, even when the result is sometimes apparently beneficial to the child. Even if all the benefits which the majority claims to have accrued to the child by virtue of the father's unilateral actions are true, this does not mean this child's future is going to be a happy and productive one. It is also not an acceptable, logical conclusion that because the father has forced some beneficial actions unilaterally that shared custody is appropriate.

Shared custody as it finally has evolved in Pennsylvania cannot be justified on this record because the fundamental

requirements for awarding shared custody have been violated blatantly by the father. It is also not appropriate for this Court to second guess the trial judge in his determination that the father took unilateral action without the approval of the court and did so to improve his position vis-a-vis the mother. The requirements of *In re Wesley J.K.*, 299 Pa.Super. 504, 445 A.2d 1243 (1982), have not been met, and to tell the trial court that in following *Wesley* it has violated the requirements for an appropriate shared child custody award is to rewrite the law and impose a totally new standard. The majority informs the domestic relations legal community that to win a shared custody award one need only unilaterally and secretively engage in practices and programs which may appear to have some benefit to the child. Following the majority analysis, the best interest would then require shared custody be awarded to the dominating parent. This should not be the message we impart to the volatile field of custody jurisprudence.

This Court would serve family law better in this case by supporting judicial action which, while recognizing, accepting and perpetuating whatever benefits to the child resulted from the father's actions, condemns improper means of achieving them and supervises the child's custody and developmental progress to assure continued stability. The path chosen by the majority will result in more acrimonious legal entanglements which will create more serious problems in the child's future.

The following excerpts from the trial court's Opinion clearly establish the appropriateness of his decision.

—Dr. Carabello, child's pediatrician and family friend, had advised parents not to enter the child in speech therapy until at least age four—to permit her own speech patterns to develop. Right or wrong the mother was acting pursuant to medical advice. The father took child to another doctor, a rehabilitation institute, and entered her in speech therapy, without any of these outside resources contacting the mother or Dr. Carabello. (Slip Op., Ludgate, J., 10/24/90, p. 4.) Mother received no information concerning

the child's enrollment in speech therapy until her attorney requested it.

—Dr. Carabello testified ten hours per day at the day care center was excessive for a three year old child, considering kindergarten is only four hours, morning or afternoon, for children five to six years of age. Even after the mother was informed of enrollment in day care, she could obtain no information from the center. (Slip op. p. 4.)

—Mother is the primary caretaker, has a flexible work schedule, nursed the baby and her work permits her to spend hours at a time with Kelsey. (Slip op. p. 5.)

—Employee of the Treasury Child Development Center had been informed by father *not* to tell the mother Kelsey had been enrolled and she did not do so. The speech therapist of Reading Rehabilitative Hospital testified their efforts appeared to be directed toward better articulation and expression and *she did not appear to have any under-developmental problems.* She also testified she did not inquire of the mother even after receiving a letter from the attorney. (Slip op. pp. 10–11.) This creates serious concerns because speech problems in young children are frequently related to emotional disturbances in the child's environment. To proceed with therapy without a family evaluation and discussion with both parents about the problems appears to be wholly improper.[1] To proceed in such therapy at age three is also subject to serious question and should have been thoroughly explored within the court setting.

—A baby-sitter, Dorothy Maxwell, testified that on at least one occasion, in June 1990, she saw the father leave

1. The majority castigates this writer for making the above statement without supporting authority (Montemuro, J., footnote 8). The authority is my extensive experience as a trial judge in Juvenile Court in many cases in which speech problems were manifested. To the knowledge of this writer, the etiology of emotional problems in such cases and the need to involve the parents in the treatment process was unequivocally a paramount consideration by the experts and treatment of persons in alleviating the conditions. It is very likely that the speech problems resulted from the anger and hostility surrounding the custody disputes in this case.

the child in the house unattended but because the father returned shortly thereafter, she took no further action. (Slip op. p. 11.)

—The father testified he took unilateral and secretive action because he anticipated resistance from the mother. (Slip op. p. 16.) Yet, when the mother learned of these things, she placed the child's best interest above her personal feelings and did not disrupt therapy, ultimately stipulating to it as the basis of the interim Order of July 12, 1990. To conceal this activity, father never confided in any progress being made in toilet training and returned the child to the mother in diapers even when diapers were not necessary. (Slip op. p. 17.) Work books for therapy in the home were never shared with the mother until August 23, 1990.

—An expert in custody evaluation, Dr. Gordon, testified the child should have a sense of permanency, and if the father continues to have the right of first refusal (to implement his own plans), it would be harmful to Kelsey because she is now suffering from confusion. Dr. Gordon also testified the parties were extremely diverse in their personalities and in their parenting style. (Slip op. p. 19.)

The trial court's Opinion states with unwavering certainty that joint custody is not appropriate in this case and that statement is clearly supported by the evidence and his findings.

> The Superior Court has stated that "[h]ostilities between the parents are relevant only insofar as they constitute a threat to the child or affect the child's welfare." *Nancy E.M. v. Kenneth D.M.*, [316 Pa.Super. 351] 462 A.2d 1386, 1388 (Pa.Super.1983). In the instant case, the hostility and anger displayed by Perry Andrews has indeed affected Kelsey Andrews' welfare. These affects are evidenced by Father's unilateral actions regarding speech therapy, daycare and toilet training, as well as the confrontation between Father and Mother in which Father called Mother vulgar and demeaning names in the presence of Kelsey.

A minimal degree of cooperation between parents is an important consideration in awarding shared custody. *In Re: Wesley J.K.*, [445 A.2d] at 1249. A review of the testimony reflects that even a minimal degree of cooperation is lacking. Prime examples of this lack of cooperation are the Father's actions in taking Kelsey to the doctor, to the therapist, to child care and in keeping the Mother in the dark about the child's progress in toilet training.

One of the major considerations in a joint custody Order is that the parties will be able to cooperate in promoting the child's best interest. "The rationale behind the minimal cooperation requirement is that if the parents have total inability to make cooperative decisions relating to the child, the child will ultimately be harmed." *DeNillo v. DeNillo*, 535 A.2d 200, 204 (Pa.Super.1987) (Beck, J. dissenting).

The hearing Judge must award custody to the party who had proven by a preponderance of the evidence to be superior. *Murphey v. Hatala*, [350 Pa.Super. 433] 504 A.2d 917, 924 (Pa.Super.1986), citing *In Re: Custody of Hernandez*, [249 Pa.Super. 274] 376 A.2d 648 (1977). The underlying theme in this case is one of the manipulation of a child through a pattern of secrets. The unilateral actions of the Defendant that evidence his inability to act in a cooperating manner about Kelsey [sic]. It is not a question of who has cared for the child when it is advantageous for litigation, but rather it is a question of who has cared for this child with the child's best interests in mind.

(Slip op. pp. 20–21.)

I would affirm the decision of the trial court supported by his exhaustive and well reasoned Opinion which stated:

There is also no doubt that by the Father's own admissions, he participated in this ongoing pattern of behavior, by making unilateral decisions regarding Kelsey's life, irrespective of Mother's opinions or Kelsey's best interest. He continually put Mother in a "no win" situation

and actively undermined the Mother/Child relationship. Mother's acquiescence to his unilateral actions are not viewed by this Court as examples of a weak personality, but as one who acted to minimize the emotional trauma on her child, and as one who refused to "escalate" the war.

(Slip op. pp. 25–26.)

The court concluded, and the record supports the conclusion, the mother was cooperative and supportive of actions that benefited the child while the father continually struck his own course without consulting the mother. We may not set aside this judgment. *See In Re Robinson*, 505 Pa. 226, 478 A.2d 800 (1984).

I would affirm the Order of the trial judge.