# Grabko v. Grabko

C.P. of Monroe County, no. 758 DR 1993.

*Jeffrey J. Kash,* for plaintiff.
*Michael R. Muth,* for defendant.

WORTHINGTON, *J.,* April 2, 2004—Thomas R. Grabko, Father, and Diane Grabko, Mother, come before this court concerning custody of their son, Thomas Grabko, age 14, born February 26, 1990. Mother and Father were married on July 29, 1989. Father filed a complaint in divorce on May 2, 2000. The parties were divorced by decree dated February 5, 2004. The parties first began to litigate this custody dispute in 1993. At all time material hereto the parties have enjoyed shared legal and shared physical custody with Mother having primary physical custody.

On May 1, 2003, Father filed a petition for modification of custody, which is now before us for disposition. On March 18, 2004, we conducted a full evidentiary hearing on Father's petition for modification of custody. At the hearing we heard testimony from Mother, Father and Thomas.[1]

---

1. Thomas' testimony was heard in chambers.

Based upon the testimony before this court and the arguments of counsel, we find it is in Thomas' best interest to grant Father's petition.

In Pennsylvania, the state legislation has defined elements which are to be considered in custody cases. The statute, in relevant part, is as follows:

"(a) General rule.—

"(1) In making an order for custody or partial custody, the court shall consider the preference of the child as well as any other factor, which legitimately impacts the child's physical, intellectual and emotional well-being.

"(2) In making an order for custody, partial custody or visitation to either parent, the court shall consider, among other factors, which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the noncustodial parent and the child." 23 Pa.C.S. §5303.

As interpreted by the courts of Pennsylvania, the statute requires that in any custody case, the court's paramount concern must be for the best interest of the children. *Wiseman v. Wall,* 718 A.2d 844 (Pa. Super. 1998); *Mumma v. Mumma,* 380 Pa. Super. 18, 550 A.2d 1341 (1988). The child's physical, intellectual, moral and spiritual well-being is of the utmost importance. *Wiseman,* 718 A.2d at 847; *Swope v. Swope,* 455 Pa. Super. 587, 689 A.2d 264 (1997). However, these concepts are nebular terms rendering them amenable to neither simple definition nor application. See *Morris v. Morris,* 271 Pa. Super. 19, 412 A.2d 139 (1979). There are no presumptions in favor of either parent and the court must make

its determination based solely on the particular facts and circumstances of each case. *Sawko v. Sawko,* 425 Pa. Super. 450, 625 A.2d 692 (1993). In short, this court is obliged to consider all relevant factors that could affect the child's well-being. *Andrews v. Andrews,* 411 Pa. Super. 286, 601 A.2d 352 (1991), *alloc. granted,* 533 Pa. 605, 618 A.2d 397 (1992), *aff'd.,* 533 Pa. 354, 625 A.2d 613 (1993). Keeping the above standards in mind, and taking into account all of the testimony and evidence before the court, we find that it is in Thomas' best interest to grant Father's petition.

We first considered each parent's employment stability. Father is employed by New Jersey Transit and earns approximately $40,000 a year.[2] Mother is currently employed as a certified nurse and works approximately 40 hours a week at a rate of $10 an hour. Mother works the overnight shift from 11 p.m. to 7 a.m. There is no evidence that either party is facing any job instability. Thus, the parties' employment stability is equal.

Although neither party is facing employment instability, we do have some concerns related to Mother's employment. Presently Mother works the overnight shift and Thomas is home alone at night. Because of this, there is no one to assist Thomas in the event of an emergency. Additionally, it has come to our attention that Thomas has an excessive number of absences from school. We suspect that Thomas may be staying up late since there is no one to make sure that he goes to bed at a reasonable hour. We believe this may be contributing to his exces-

---

2. Thomas currently receives coverage from Father's health insurance.

sive number of absences. Since Father holds a job with regular hours, we believe that awarding him primary physical custody will alleviate both of these concerns.

We next considered any occupants of the custodial home. Thomas currently resides with Mother in a small trailer located in Lehighton, Pennsylvania. Thomas has his own bedroom and there are no other occupants in the home. Father currently lives alone in Kunkletown, Pennsylvania. Father's home has three bedrooms. JR, a/k/a fur-fur, who Thomas considers to be his dog, also resides with Father. During his testimony, Thomas indicated that he has a great deal of affection for fur-fur. We believe that Thomas will benefit by being reunited with his dog. Father also intends to make a spare bedroom available to Thomas for recreational purposes.

There was little evidence presented concerning the condition of either parties' home since neither parent believes this is of grave importance.

While staying with Father, Thomas is exposed to a number of positive recreational activities. This is significant since Thomas is not involved in any sports and/ or clubs. Thomas does, however, enjoy skateboarding. Father has built Thomas several skateboarding ramps located at his home.[3] This is significant since both parties have indicated that Thomas hangs around with friends that they consider undesirable. With the skateboarding ramps located at his house, Father is able to keep an eye on Thomas and his friends. Father has also enrolled Thomas in guitar lessons and introduced him to the world of

---

3. Father also frequently takes Thomas to skateboarding parks.

toy trains, a hobby that Thomas and Father enjoy together. We believe the availability of these recreational activities should help prevent Thomas from getting involved with the wrong crowd.[4] It also allows Thomas to enjoy activities with Father, strengthening their relationship.

We next considered Thomas' wishes. The child's express wishes are not controlling in our custody determination, but they do constitute an important factor that must be carefully considered in determining what is in the child's best interests. *Myers v. DiDomenico,* 441 Pa. Super. 341, 346, 657 A.2d 956, 958 (1995). When considering the child's wishes, we must be mindful of the child's maturity, intelligence and reasoning. *Id.* During the hearing, Thomas testified that he loves both of his parents. Thomas never expressed a clear preference for living with either of the parties.[5] We found Thomas to be somewhat immature for his age. He has changed his mind several times throughout the course of litigation regarding his preference. We believe he prefers to have the court make its decision based on factors other than his expressed preference. These feelings are certainly not unusual for a child involved in custody litigation.

---

4. Thomas has, in fact, shown a tendency to get involved with the wrong crowd. In support of this conclusion, we note that Thomas was recently suspended for five days following an incident involving a fake marijuana cigarette. We fear that Thomas may get involved with real drugs if he does not receive proper guidance.

5. In the report prepared by Dr. John A. Abbruzzese Jr., Ph.D., the doctor indicates that Thomas expressed a preference for living with Mother. (See joint exhibit 4, report of psychological evaluation.) At the hearing, Thomas expressed no such preference.

We next considered Thomas' spiritual and intellectual well-being. We have no concerns regarding Thomas' spiritual well-being. Neither of the parties regularly attends church and Thomas does not participate in church activities. We do, however, have several concerns regarding Thomas' intellectual well-being. During the hearing, Father testified that he is seeking primary physical custody in order to improve Thomas' academic performance.

The evidence of record establishes that Thomas is chronically absent from school, and that he frequently fails to complete his homework assignments. Thomas is currently a student at the Palmerton Area Middle School. He is in the eighth grade.[6] During the current academic year, Thomas has been absent from school approximately 15 days. (See plaintiff's exhibit 1, report from Palmerton Area Middle School.) In the seventh grade, Thomas was absent 34 days, and he was tardy an additional four days. (See plaintiff's exhibit 1, report from Palmerton Area Middle School.) Father testified credibly that Thomas missed approximately 54 days in the sixth grade. We are alarmed by Thomas' poor attendance. As a consequence of Thomas' poor attendance record and failure to complete his homework assignments, he has failed numerous subjects.

It is Mother's position that Thomas has several health problems which have caused him to be absent from school. Mother claims that Thomas suffers from sinus disease and irritable bowel syndrome. Mother believes

---

6. During the majority of Thomas' schooling, he was a student in the Pleasant Valley school system. If Father is awarded primary physical custody, Thomas will once again be a student at Pleasant Valley.

that the school absences were necessary due to these medical conditions. In response, Father testified credibly that Thomas often exaggerates his illnesses in order to avoid going to school. This conclusion is also supported by the report prepared by Dr. Abbruzzese. (See joint exhibit 4, report of psychological evaluation.) Father also notes that Thomas continued to miss school even after his sinus problem was resolved.[7] Although we believe that Thomas has several valid medical conditions, we believe the record supports Father's claims.

With these observations in mind, we note that Father has shown greater concern regarding Thomas' school attendance. The record establishes that Father has taken several proactive measures in an attempt to improve Thomas' poor attendance record. Father testified credibly that for a period of time he would call Thomas every morning to make sure that he was going to school.[8] We also find it significant that last year Thomas attended summer school classes every day when Father had custody. In fact, Thomas also attended summer school following the sixth grade during Father's period of custody. Thomas would have been held back in school both times had he not successfully completed summer school.

If Father is awarded primary physical custody, we believe Thomas' school attendance will drastically improve. During the hearing Mother stressed the fact that Father is at work when Thomas leaves for school. For this rea-

---

7. We also find it significant that Thomas attended summer school every day during Father's period of custody.

8. As with all strong-willed children, Thomas eventually began to lie to Father. For this reason, Father stopped calling Thomas in the mornings.

son, Mother claims that Thomas will still be able to skip school even if Father is awarded primary physical custody. Initially, we note that Mother is also at work when Thomas leaves for school.[9] In addition, Father testified credibly that he has located a neighbor who is willing to come to his home in the morning, after he leaves for work, and make sure Thomas leaves for school. Additionally, Thomas' perfect summer school attendance during Father's period of custody demonstrates that Father has been able to achieve progress in this area. We also agree with Father and believe that his ability to achieve significant progress in this area has been impeded by the fact that he does not have primary physical custody.

Father has also shown far greater concern regarding Thomas' academic performance. Father routinely calls and meets with Thomas' teachers, as well as other school officials, regarding his progress. Father was also more informed about Thomas' homework assignments.[10] We believe Father will take proactive measures to improve Thomas' academic performance if he is awarded primary physical custody. Father testified that if he is awarded primary physical custody he will begin by contacting the Sylvan Learning Center for additional instruction for Thomas. Father also indicated that he would not allow Thomas to go out after school until he has completed his homework assignments.

---

9. Mother testified that she works nights and does not arrive home until 7 a.m., after the time Thomas leaves for school. Father also testified that he leaves for work very early, 5:30 a.m., and that he would not be home when Thomas ordinarily leaves for school.

10. We note that Father testified in depth regarding a homework hotline.

We find Mother's response to Thomas' academic struggles to be inadequate. Mother's demeanor during her testimony made it apparent that she has adopted a lackadaisical attitude toward Thomas' schooling. In fact, it seems as though Mother has given up any hope of correcting deficiencies in this area. We believe the attitudes of the parties could not be in any greater contrast. For example, Mother testified that Thomas needs to take responsibility for his own performance, and that there were no corrective measures that she could take.[11] Mother also testified that she only meets with his guidance counselor every couple of months. We also find that Mother is less concerned about missed homework assignments than is Father. In support of this, we note her testimony that she occasionally checks the homework hotline and that she only occasionally checks to see whether Thomas has completed his assignments.

We note that Mother appeared upset when she testified about Father's decision to have Thomas attend summer school during his period of custody. Mother testified that her plans to have Thomas attend summer school during her period of custody were thwarted by Father's actions. Mother appeared highly agitated when she was testifying about this matter. We find this to be disturbing in light of the fact that Thomas had perfect attendance and managed to hand in all of his assignments during

---

11. Mother testified that her daughter from a previous marriage went through a similar phase, and that Thomas will eventually grow out of it. However, it is clear from the record that Thomas has been struggling for several years, and that this is more than just a phase. In fact, during cross-examination Mother acknowledged that Thomas has made no progress over the past six quarters.

this period. In our opinion, Mother should be pleased with Thomas' results during this period. We suspect she is upset since the progress that Thomas made during this period supports Father's petition.

Although we agree with Mother and believe that Thomas should eventually assume responsibility for his own work, we believe he is in need of strong guidance. This conclusion is supported by Dr. Abbruzzese's report. (See joint exhibit 4, report of psychological evaluation.) If no immediate action is taken, we believe that Thomas will suffer irreparable injury. If the current custody arrangement is continued, Thomas will continue to struggle in school.

We next considered Thomas' physical well-being. We have only a few concerns. As noted above, there was testimony indicating that Thomas suffered/suffers from several physical ailments including sinus disease and possibly irritable bowel syndrome. We have no doubt that both parties will be attentive and seek any professional treatment needed by Thomas. However, we are somewhat concerned that Mother smokes in front of Thomas when he is suffering from an upper respiratory infection. We are also concerned that Thomas is smoking cigarettes. Additionally, if Thomas is smoking, immediate discipline is required. We believe Father is far more likely to provide the necessary discipline.

We also have some concerns regarding an incident that occurred during the current academic year. As noted above, Thomas was recently suspended for five days following an incident involving a fake marijuana cigarette. We believe that Father responded to this incident

in a far more appropriate manner than Mother. Following the incident, Thomas attended a session with a school counselor. Father accompanied Thomas during the session. Although Mother was aware of the incident, she failed to attend this and other meetings relating to the incident. We find Mother's attitude regarding this incident to be disturbing. Mother testified that she was unable to attend the meeting due to car problems. It is clear from the record that Mother was home when Father picked Thomas up from her house. Mother never asked for a ride. Although Father never invited her to come along, we believe it was her responsibility to ask for a ride. Mother also failed to attend several subsequent meetings regarding this incident. Mother blames both Father and school officials for failing to inform her about the meetings. We believe Mother should have taken the steps necessary to inform herself, and that she is making excuses for her inactivity.

We next considered Thomas' emotional and psychological well-being. After studying the report prepared by Dr. Abbruzzese, it is clear that Thomas has suffered as a result of the parties' failed marriage. Dr. Abbruzzese also indicates that Thomas has a strong relationship with both parties. Thomas confirmed this during his testimony. Although Dr. Abbruzzese's report indicates that Thomas prefers the current custody arrangement, we believe it is necessary to grant Father's petition.[12] Thomas loves both parties so it is clear that he will not suffer any additional emotional or psychological harm if we grant Father's

---

12. Thomas did not express any such preference during his testimony to this court.

petition. Furthermore, because Thomas has a number of friends who are students at Pleasant Valley, he will not suffer any added emotional strain as a result of adjusting to a new school. Finally, because Thomas has a strong relationship with both parties, we find Father is equally capable of meeting Thomas' psychological and emotional needs.

We must consider which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the noncustodial parent and the child. 23 Pa.C.S. §5303(a)(2). Since there is no evidence that either party would frustrate physical access with the noncustodial parent, we find this to be a non-factor in our analysis.

We also note that Father has demonstrated a much more insightful attitude in this matter. It is apparent that Father has the ability to effectively put his personal feelings aside and work for what is in Thomas' best interest.[13] In stark contrast, Mother continues to hold a great deal of animosity toward Father. Rather than acknowledge her own shortcomings, Mother blames Father for her failure to attend meetings and acquire information concerning Thomas. Mother also fails to give Father even the slightest bit of credit regarding Thomas' performance during summer school. Mother also appeared visibly irritated during her testimony and became combative during cross-examination. In fact, Mother made excuses and

---

13. In support of this conclusion, we note Father's testimony that Mother is a good parent, and that she loves Thomas. Father's only criticisms of Mother as a parent relate to discipline and schooling.

blamed others for Thomas' academic struggles, while Father outlined his plan for fixing the problem. We believe that Thomas desperately needs the type of strong guidance that Father can provide. Although we agree with Mother and believe that Thomas eventually needs to take control of his own life, we believe it is imperative that we grant Father's petition before it is too late.

After reviewing the testimony, exhibits, and psychological evaluations, we find it is in Thomas' best interest that Father be awarded primary physical custody.

Accordingly, we enter the following:

## ORDER

And now, April 2, 2004, it is hereby ordered as follows:

(1) Father's petition for modification of custody is granted as follows:

(2) Shared Legal Custody

Mother and Father shall share legal custody of their child. For purposes of this order, "shared legal custody" shall mean:

(a) All decisions affecting the child's growth and development, including but not limited to education, choice of school, medical and dental treatment, religious training, athletic pursuits and extracurricular activities shall be considered major decisions, and shall be made by the parties jointly after discussion and consultation with each other with a view toward obtaining and following a harmonious policy in the child's best interest;

(b) Each party shall keep the other informed of the progress of the child's education and social adjustment. Each party shall not impair the other party's right to shared legal or physical custody of the child. Each party shall give support to the other in the role as parent and take into account the consensus of the other for the physical and emotional well-being of the child with the recognition that their lifestyles may be different;

(c) While in the presence of the child, neither party shall make or permit any other person to make any remarks or do anything which would in any way be construed as derogatory or uncomplimentary to the other parent. It shall be the express duty of each parent to uphold the other parent as one whom the child should love and respect;

(d) It shall be the obligation of each parent to make the child available to the other in accordance with the following schedule and to encourage him to participate in the plan hereby set forth;

(e) Each parent shall have the duty to notify the other of any event or activity that could reasonably be expected to be of a significant concern to the other parent or to the child;

(f) The parents shall communicate with one another concerning any parenting issues requiring consultation and agreement regarding a proposed modification of the custody schedule which may, from time to time, become necessary, and shall specifically not use the child as a messenger at any time. Neither party shall discuss with the child any proposed changes to this schedule or any

other issue requiring consultation and agreement prior to discussing the matter and agreement with the other parent;

(g) With regard to any emergency decisions which must be made, the parent with whom the child is physically residing at the time shall be permitted to make a decision necessitated by the emergency without consulting the other parent in advance; however, that parent shall inform the other of the emergency and consult with him or her as soon as possible. Day to day decisions of a routine nature will be the responsibility of the parent having physical custody at that time;

(h) Mother and Father shall share complete and full information from any doctor, dentist, teacher or other authority, and each parent may have copies of any reports given to them as a parent. Each parent shall also request any authority to forward copies to both parents at their respective addresses. Such documents include, but are not limited to, medical reports, athletic and school reports, birth certificates, etc. Both parents may and are encouraged to attend conferences and activities with the child. Both parents shall be listed with any school or day care center as parents to be contacted in the event of an emergency and to be notified regarding school events. Mother and Father shall share copies of any school notices in a timely fashion;

(i) Both parents shall attempt to avoid scheduling any activities or appointments for the child which would require his attendance or participation during the time when he is scheduled to be in the physical custody of the other parent without the parent's prior approval; however, both

parents agree to cooperate and be flexible in accommodating the child's scheduled activities.

(3) Shared Physical Custody

Father shall have primary physical custody under and subject to Mother's periods of partial custody as follows:

(a) Mother shall enjoy partial physical custody on alternating weekends from Friday at 6 p.m. and ending on Sunday at 5 p.m.

(4) Summer Schedule

Commencing the first weekend following the last day of school or on Friday preceding Father's Day weekend, whichever comes first, the parties shall alternate physical custody on a weekly basis from Friday at 6 p.m. until Friday at 6 p.m. The alternating periods of custody shall cease on the second Sunday preceding the commencement of school, at which time the school schedule shall take effect.

(5) Holidays

The following holiday schedule supersedes all other partial and vacation custody schedules established in this order:

The parties shall alternate the major holidays. The alternating holiday schedule shall include the holidays of New Year's Day, Presidents' Day, Easter, Memorial Day, Fourth of July, Labor Day, and Thanksgiving. Mother shall have partial custody on Mother's Day and Father shall have partial custody on Father's Day. Those periods of partial custody for which no times for exchange were heretofore scheduled shall begin at 9 a.m. and end

at 8 p.m. These periods of holiday custody shall begin with Mother on Easter 2004.

The parties shall alternate Christmas. Mother shall have physical custody of the child from noon on Christmas Eve until noon on Christmas Day. Father shall have physical custody of the child from noon on Christmas Day until noon on December 26. The above period shall alternate each and every year.

In the event that a holiday to which Mother is entitled shall fall within a day prior or subsequent to weekend period of partial custody to which Mother would also be entitled, that period of weekend partial custody shall be extended to include Mother's period of holiday partial custody.

(6) Telephone Access

Each parent shall allow the other parent to have private, liberal and reasonable telephone access with the minor child during that parent's period of partial custody. This shall include the child initiating such contact. Reasonable telephone access shall be construed to be during the child's normal waking hours, emergencies excepted. If the calling parent leaves a message at the residence of the custodial parent, custodial parent shall require the child to return the telephone call to the noncustodial parent.

(7) Transportation

The parents shall share transportation equally as they can agree. If they are unable to agree, in order to facilitate the exchange of partial custody, it shall be the responsibility of the party who will be obtaining partial

custody, or a designee, to pick up the child at the residence of the other party. Appropriate passenger restraint devices shall be utilized by the child while being transported by Mother and Father.