619 A.2d 339

**Robert D. and Jackie NORRIS, Appellants,**

v.

**Lisa TEARNEY and Robert D. Norris, Jr.**

Superior Court of Pennsylvania.

Submitted Nov. 2, 1992.

Filed Jan. 14, 1993.

Robert S. McMichael, Oxford, for appellants.

Richard A. Katz, Lancaster, for appellee.

Before CAVANAUGH, DEL SOLE and HESTER, JJ.

HESTER, Judge:

This is an appeal from an order denying Robert and Jackie Norris, appellants-grandparents, visitation with their grandson, two-year-old Damien Tearney. We agree that visitation would interfere with the parent-child relationship under the facts of this case, and therefore, affirm.

Appellants' son, Robert Norris, and appellee, Lisa Tearney, met and began a relationship while both were hospitalized for depression in the psychiatric unit of a local hospital. Shortly after the relationship began, appellee became pregnant, and within a few months, Robert ended the relationship. Appellant Jackie Norris testified that she attempted to stay in touch with Lisa and offered to help her. The record is clear that Mrs. Norris was the one who attempted to maintain a relationship with Lisa, who did not reciprocate. Lisa has a nine-year-old daughter, Amber, from another relationship which also did not culminate in marriage.

The record reveals that Lisa wanted appellants' son to marry her and was devastated by his abandonment. The testimony of Lisa's psychologist, Dr. Eugene Homan, established that when Amber was born to Lisa, the failure of the relationship with Amber's father caused Lisa's first bout with depression, which resulted in her 1989 hospitalization. During that time, she met appellants' son. Dr. Homan testified that when Lisa became pregnant with Damien, and Robert refused to continue a relationship with her, her depression recurred. Lisa was hospitalized again shortly after Damien's birth. Dr. Homan testified that Lisa "was definitely depressed, struggling, falling apart . . . struggling with whether she could do it and whether she should consider adoption." Notes of Testimony ("N.T."), 2/18/92, at 98.

Mrs. Norris testified that she visited Lisa and Damien in the hospital and brought Damien to their home a few times between his birth in March, 1990, and May, 1990. There were no further visits until December, 1990, due to two significant occurrences. First, Robert married another woman on June 2, 1990. Second, Robert denied paternity of Damien. Eventually, blood testing established that Robert Norris indeed is the father of Damien. *Id.* at 50, 57. Robert Norris, by his choice, has had no contact with Damien. He now has a child by his wife. *Id.* at 63.

Grandparents assert that it is the policy of the Commonwealth of Pennsylvania to permit visitation by grandparents unless overriding factors are involved and that none exist in the present case. They claim that they met their burden of establishing that their visitation with Damien is in his best interest and that appellee failed to prove that there would be any detriment to Damien by permitting them visitation.

 Whether the matter concerns custody or visitation, our paramount concern is the best interest of the child. *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992). This is equally true in cases involving whether grandparent visitation rights should be awarded. *Bishop v. Piller,* 399 Pa.Super. 52, 581 A.2d 670 (1990), petition for allowance of appeal granted, 527 Pa. 661, 593 A.2d 837 (1991). In *Stolarick v. Novak,* 401 Pa.Super. 171, 584 A.2d 1034 (1991), we reiterated

our scope of review as defined in *Mumma v. Mumma,* 380 Pa.Super. 18, 21, 550 A.2d 1341, 1343 (1988), as follows:

In reviewing a custody order, we are not bound by findings of fact made by the trial court which are unsupported in the record, nor are we bound by the court's inferences drawn from the facts. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 294–95, 368 A.2d 635, 637 (1977). However, on issues of credibility and weight of the evidence, we defer to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. *Id.* at 295, 368 A.2d at 637. Only where we find that the custody order is "manifestly unreasonable as shown by the evidence of record ..." will an appellate court interfere with the trial court's determination.

*See also Karis v. Karis,* 518 Pa. 601, 544 A.2d 1328 (1988); *Andrews v. Andrews,* 411 Pa.Super. 286, 601 A.2d 352 (1991). "In a grandparent visitation case, the grandparent has the burden to prove that it is in the child's best interest to have 'some time' with the grandparent." *Bishop v. Piller, supra,* 399 Pa.Super. at 56, 581 A.2d at 672 (citation omitted).

23 Pa.C.S. §§ 5311–5313 provide three instances in which the court may consider visitation for grandparents. Section 5312 is applicable to the instant case.

[W]hen parents have been separated for six months or more, the court may, upon application of the ... grandparent ... grant reasonable partial custody or visitation rights, or both, ... if it finds that visitation rights or partial custody, or both would be in the best interest of the child *and would not interfere with the parent-child relationship.* The court shall consider the amount of personal contact between the parents or grandparents of the party and the child prior to the application.

23 Pa.C.S. § 5312 (emphasis added).

Appellants first claim that they satisfied their burden of proof that visitation would be in Damien's best interest, as evidenced by the trial court's statement, "This Court does not in any way question the paternal grandparents' love of and devotion to Damien." Trial court opinion, 7/7/92, at 3. We

agree that the record certainly does support the trial court's conclusion that appellants love their grandson and desire to establish a relationship with him even though their son, Damien's father, does not. However, their expressions of love and desire to be involved with Damien do not satisfy the requirement that their visitation with Damien must be in his best interest. Further, the trial court, while acknowledging their love, clearly concluded that "it is not in the best interest of Damien to maintain visitation with his paternal grandparents." *Id.* at 4. The trial court determined that visitation with appellants "adversely affects mother and this, in turn, creates a severe negative impact upon Damien." *Id.*

Appellants contend that they satisfied their burden of proof by establishing a pattern of visits that were helpful to appellee and assert that there was no concrete evidence that the visits were a detriment to Damien. We disagree. Appellee testified that she simply could not cope with appellants' visits with Damien in light of the fact that their son had abandoned her and Damien. Lisa testified that she was unable to separate appellants from their son. It is apparent from our review of the record that on an intellectual level Lisa understands appellants' desire to see Damien. Unfortunately, she suffers from severe depression which is exacerbated by appellants' attempts to be involved with Damien.

There was extensive testimony from Lisa's treating psychologist of the extent of her depression. Dr. Homan testified that when Lisa's depression builds, she becomes dysfunctional and overwhelmed. He described it as follows:

All tasks seem monumental. She feels that she's dead inside. It's just a total blackness and being down, feeling worthless, hopeless. She almost becomes paralyzed or numb with her feelings, and this is pretty visible. It's not like a hidden thing that anyone who knows Lisa, if they were around her any of these times, they could see what's happening, she's heading downhill.

N.T., 2/18/92, at 68.

Appellants attempt to equate the instant case with *Bishop v. Piller, supra.* In *Bishop,* as here, the child's parents never

married. However, the father's name was placed on the birth certificate and his insurance covered the costs of the birth. Additionally, the mother and child lived in the paternal grandmother's home after the child's birth. Subsequently, the child's father became incarcerated, but father and grandmother visited with the child and provided food, clothing, and baby formula. The trial court in *Bishop* granted the grandmother's request for visitation and specifically determined that the mother was unable to produce concrete evidence that there would be any detriment to the child by spending time with his grandmother.

In the present case, both Lisa and her psychologist described the effect of the visits with the Norrises on Lisa and the resulting effect on Damien. Dr. Homan testified that after Damien's birth, Robert Norris's rejection of Lisa precipitated her regression and subsequent hospitalization. N.T., 2/18/92, at 77. When asked to try to capture the essence of Lisa's difficulty coping with visitation by the Norrises, Dr. Homan stated:

Well, she sees it as just totally unfair in feeling that people have not done what they're supposed to do, and on the other hand, people come in and have control over her and they don't have rights to. It reactivates many conflicts areas.

Really part of it is I think it's unfair if he's not involved, should they be involved. I think she feels very much that there's a difference of values and style. She feels she can't trust them. She feels she may be losing her son to them. It gives Bob some access and which I think the angry side of her feels he doesn't deserve anything that he's totally abandoned her and has shown no interest at all in this child in any way with any visiting.

So, yes, it stirs up an awful lot of feeling which is very conflicted. Lisa will say to me I know I shouldn't feel this way but it's overwhelming to her, and I know I spent considerable time over several months trying to advocate for her to try to accommodate to this thing that if grandparents could be involved in a helpful way, maybe this could be

of help and that it would give you a day where you would have a break so to speak.

But as we discussed it over and over, I know I became convinced that there is—this just won't budge. It's like, you know, well, it's tremendously deep.

*Id.* at 77–78. When asked about the effects on Lisa if the grandparents would be granted regular visits, Dr. Homan stated, "Honestly, it scares me some. I feel that she could decompensate, deteriorate. I truly feel that." *Id.* at 79. Such a deterioration of Lisa's mental health then has a domino effect, because when she becomes incapacitated due to her depression, she cannot care for herself or her children. *Id.*

Lisa also described the effect of the visits with the grandparents on her psyche and the concomitant effect on her son.

The Norrises wanted to visit with Damien and although it was difficult for me, I let it proceed because I felt that's the way it should be. After a few visits I, myself, could not, I hate to keep hearing this word, I just couldn't deal with seeing them and so I discontinued it.

It was more my concern of how I was reacting to their visits, and I didn't know if it affected the way that I reacted to Damien, and I thought it was not right. So instead of continuing my behavior like that, I said, no, I just had to stop it.

*Id.* at 121. Counsel for appellee asked her how the visits affected her relationship with Damien. Lisa responded:

Physically, it really didn't change but when I had to deal with my son, I felt a distance. I felt I just—there was something that was lacking there. And until some time lapsed, you know, I eventually got over that feeling but it made me feel very guilty that I should feel that way towards my own son.

*Id.* On cross-examination, counsel for appellants also asked Lisa about the effect of appellants' visits on Damien.

Q. And you said aside from that time it took for it [the depression] to pass, it didn't affect you and Damien as being mother and child?

A. Yes, it did.

Q. You said earlier it didn't affect him at all, it affected you?

A. That's right, and I'm the one that has to care for Damien.

Q. Well, you were still able to take care of him, weren't you?

A. Barely. He got his food and diaper changed but the emotions weren't there and that's, to me, what's more important—not more important but equally important.

*Id.* at 137–38.

The record clearly supports the findings of the trial court. Like the trial court, we have no doubt that visits with the grandparents under the facts of this case interfere with the parent-child relationship.* While it likely would be in this child's best interest to have contact with his grandparents, in light of Lisa's severe depression, and the fact that her condition worsens upon contact with the Norrises, the parent-child relationship suffers. Damien is still very young. He is totally dependent upon his mother, not only for his physical needs, but also for his emotional nurturing.

We also reject appellants' argument that since Amber visits with her paternal grandparents, and the maternal grandparents are permitted to visit both children, "justness" demands that they, too, should be permitted to visit. First, there is no court-ordered visitation for Amber's paternal grandparents. Second, Lisa testified that Amber visits her paternal grandparents on occasional holidays when Amber's father exercises his visitation rights. Third, and most importantly, we are concerned here only with the effect of the Norris's visits on Lisa and Damien. Nothing else is relevant.

We sympathize with the Norrises and find their interest in maintaining a relationship with Damien commendable even though their son has abandoned his child. However, the reality of this situation is that their involvement with the child adversely affects appellee's mental health, which in turn adversely affects Damien. A reading of appellants' testimony

and their brief conjures up images of a perfect world where fairness and "doing the right thing" are all that matter. However, all parties in this situation must cope with the realities of it. Indeed, if "fairness" were all that mattered, Robert would be playing a vital role in the life of Damien Tearney. We are bound to give effect to every word of a statute and to construe each word according to its plain meaning. 1 Pa.C.S. § 1903(a). Where words are not ambiguous, they will not be disregarded. *Sanders v. Loomis Armored, Inc.*, 418 Pa.Super. 375, 614 A.2d 320 (1992).

While it may appear illogical to appellants that Lisa reacts so negatively to Damien's visits with them, it would seem that this emotional reaction is the hallmark of her mental illness. The visits exacerbate her condition and pose a threat to her ability to nurture her son and provide a proper environment for their relationship. We can find no compelling reason which would justify such a compromise in the child's well-being. Thus, since the Norris's visitation interferes with the parent-child relationship, the trial court was required to deny it.

Due to Damien's young age, the trial court was unable to ascertain his feelings about the visits. Aside from that fact, the following passage from another case involving grandparent visitation is pertinent.

We have stated that "the hearing judge has the opportunity to observe the demeanor of the witnesses and therefore is in the best position to determine their credibility and sincerity." *Commonwealth ex rel. Miller v. Miller*, 329 Pa.Super. 248, 255, 478 A.2d 451, 455 (1984). Thus, in exercising our independent judgment we are mindful of the fact that the trial judge had the opportunity to meet with the parties and observe their testimony. He spoke with the children in chambers and listened to the expert psychological testimony. He was able to directly evaluate the children's needs based on his first-hand observation of the children, the experts and the relatives.

*Suroviec v. Mitchell*, 347 Pa.Super. 399, 401–02, 500 A.2d 894, 895–96 (1985).

We find no abuse of discretion on the part of the trial court, and conclude that its factual findings support its factual conclusions. Moreover, as the trial court's conclusions are not unreasonable in view of its factual findings, we may not interfere with those conclusions. *McMillen v. McMillen, supra.*

Order affirmed.