## Troop v. Troop

C.P. of Berks County, no. 4629-93 A.D.

*Barbara Beringer,* for plaintiff.
*Daryl F. Moyer,* for defendant.
*Terry C. Troop,* pro se.

SCHMEHL, *J.*, April 1, 1996—This opinion is written in support of this court's order of October 19, 1995, which was appealed by the defendant on November 20, 1995.

Kathryn Troop is the paternal grandmother of the child at issue. The defendant in this action is the child's mother, Linda D. Troop. The child at issue is Jonathan C. Troop, born January 22, 1986. Mother is divorced from Terry C. Troop, the father of the child. Father was later joined as a party to the action. Grandmother's petition for custody alleges that she has had a significant relationship with her grandchild over the years, and that it would be in the best interests of the child for her to have the child for a period of time to maintain a relationship. Her petition requests the court to grant custody and visitation of the child to Grandmother.

Mother filed an answer to petition for custody which included a new matter requesting the court dismiss Grandmother's petition for custody and a cross-complaint naming Father as additional defendant. The cross-complaint requested the court dismiss Grandmother's petition or, alternatively, modify a previous custody order in the custody action between the parents[1] whereby time would be allocated from the time already allocated to Father for Grandmother to see the child. Mother filed an answer to new matter and cross-complaint requesting that the cross-complaint be dismissed.

On February 14, 1994, it was ordered that Grandmother and Mother be evaluated by Lynne Mullis M.S.W. The child custody conference officer issued a report and recommended order to which Mother filed exceptions. Grandmother subsequently filed her own exceptions. Trial was set down for November 4, 1994,

1. *Linda D. Troop v. Terry C. Troop,* no. 1384-92 A.D.

however, the parties settled the matter, and an order memorializing the settlement was filed on November 28, 1994. The order stated that custody of the child was to continue in accordance with the earlier order of this court to no. 1384-92 A.D. with some modifications, including that Father would have partial custody on alternate weekends from Friday at 6 p.m. until Sunday at 8 p.m. and on Wednesdays from 5 p.m. until 8 p.m.; Mother and Grandmother were to engage in counseling at the Lutheran Home at Topton for four to six months, with Grandmother being entitled to such partial custody as the counselor determined, up to one day per month during the months of June, July and August and from 9 a.m. until 8 p.m. on the fifth Sunday of any month with five Sundays; and that during her periods of partial custody, she was not to engage in any religious practices except attending church with the child. However, shortly thereafter, on January 12, 1995, Grandmother filed a petition for emergency relief which alleged there had been some problems with the order of November 1994. An amended order was filed on February 14, 1995 which included the same modifications to the order in case no. 1384-92 A.D., except that Grandmother and Mother were to instead engage in counseling through the offices of Dr. Michelle Munson and/or Dr. Edward Hanna.

Yet another petition for emergency relief was filed on May 12, 1995 which requested the court issue an order directing the parties to abide by the recommendations of Dr. Hanna and the court order, and allow Grandmother's visitation to proceed immediately. The petition alleged that after Dr. Hanna filed a summary of mediation and recommendation on or about April 27, 1995, Mother allegedly failed to keep an additional appointment with Dr. Hanna which resulted in the can-

cellation of the session. Grandmother argued the cancellation should not delay her commencing visitation with the child. Mother filed an answer to the petition for emergency relief and a counter-petition for emergency relief which alleged that based upon her emotional anxiety over unsupervised visitation by Grandmother with the child, Mother believed that the parent/child relationship will suffer in the event Grandmother was allowed any unsupervised contact with the child. She further alleged that her religious upbringing of her son conflicted with the religious ideals of Grandmother and that Dr. Hanna did not understand the fundamental differences in child raising between Grandmother and Mother which she realized during her "emotional session" on April 17, 1995. Grandmother filed an answer to the counter-petition on June 7, 1995. The matter was then continued to October 5, 1995. On October 19, 1995, the court ordered that Grandmother was to have partial custody of the child for one weekday during the month of June for an eight hour period and for one weekday during the month of December for an eight hour period and otherwise would only have contact with the child during her son's (the child's father) periods of partial custody. This order was appealed on November 20, 1995.

What is at issue here is a mother who wishes her child to have absolutely no unsupervised contact with his grandmother due to her belief that Grandmother participates in untraditional or perhaps satanic religious rituals. "The primary concern in child custody cases is the best interests of the children, including the children's physical, intellectual, emotional, moral and spiritual well-being." *K.L.H. v. G.D.H.,* 318 Pa. Super. 330, 335, 464 A.2d 1368, 1371 (1983). In a grandparent

visitation case, the grandparent has the burden to prove that contact with the child is in the child's best interest. *Norris v. Tearney,* 422 Pa. Super. 246, 619 A.2d 339 (1993); *Bishop v. Piller,* 399 Pa. Super. 52, 581 A.2d 670 (1990), *alloc. granted,* 527 Pa. 661, 593 A.2d 837 (1991). It was this court's decision that it would be in the best interests of the child for Grandmother to have at least some contact, unsupervised and otherwise, with the child. Grandmother met her burden in proving it was best for the child to have contact with her, including unsupervised contact.

The court gave great weight to the testimony of Edward P. Hanna D.S.W., a licensed social worker, who felt that it would be good for the child to have regular contact with Grandmother. Dr. Hanna had Mother and Grandmother in mediation sessions before him. He stated that Mother had voiced continuing complaints against Grandmother, and that Mother expressed concerns about the child's safety and possible exposure to satanic and ritualistic practices, which fears he discounts. She also expressed a fear that the child would be hypnotized by Grandmother. Mother tended to be very emotional during the sessions, and simply did not want Grandmother to have contact with the child. Although he did not believe her allegations, Dr. Hanna could not discount Mother's *convictions* about Grandmother because she seemed to believe everything she said regarding the rituals and could not abide by any recommendation for visitation. Dr. Hanna stated that if Grandmother was granted unsupervised visits it would have a devastating effect on Mother and she would respond to it very badly. However, he also testified that Mother never voiced objections for the child to see Grandmother while in the presence of his father.

Dr. Hanna also stated that Grandmother seemed to understand the need not to influence the child religiously

or spiritually. She seemed willing to cooperate with the custody process. When Dr. Hanna asked the child about meetings Grandmother would hold at her house where the alleged rituals would occur, he seemed to give a report rather than a recollection or memory of what happened which indicated to Dr. Hanna a sign that Grandmother might be influencing the child, although he considered this only secondary evidence. Dr. Hanna believed that the "report" was only due to the matter having been discussed repeatedly with the child. He strongly stated that the child would suffer if he had no contact with Grandmother.

Grandmother denied being involved in witchcraft or in anything occult. She stated she had studied hypnotism years ago when she took a course and that she is a certified hypnotist. She meditates on a daily basis. She belongs to a group that gathers twice a month to sing spiritual songs and meditate. They perform a "healing circle" in which they will join hands and pray for the ill. She has been involved in meditation groups since the early 1970s. On approximately six occasions, she has had the child on overnight visits on nights when she has had meetings in her home. She was willing to do almost anything to insure the safety of the child, but did not feel she needed supervision. She was willing to abide by the recommendation of Dr. Hanna. She has never discussed with Mother what occurs at the meetings, although she had invited her to attend one when she began to have concerns about them. She stated that she had cared for the child at least one night per week all through his life up until the time the parents separated.

Grandmother once took the child to New York City without Mother's consent during a period of visitation. She seems to have not done much to assuage Mother's

fears regarding her participation in different activities. However, no evidence presented to the court justifies keeping the child away from Grandmother nor does it justify not allowing her at least some limited periods of unsupervised partial custody.

Father also testified. He has partial custody on alternate weekends. He stated he never had a set schedule with Grandmother for seeing the child, although they would try to make arrangements together. Father involves the child at this point in deciding whether or not to see Grandmother, and although recently he does not ask to go, if the opportunity is offered the child will say yes. Jonathan has, however, stated that he does not want to stay overnight with Grandmother. Father thinks that Mother's claims against Grandmother are without merit. He acknowledges Mother believes her concerns are sincere. Mother began to discuss the witchcraft and Satan worship issues with him after separation. He began to feel that his periods of visitation with the child were being threatened in that Mother would request he talk to Grandmother and tell her to stop her rituals or else he would lose his chances of seeing the child. He eventually chose not to become involved in the dispute in that he did not want to be caught in the middle and lose his custody rights. He did consent to letting Grandmother take the child to New York City.

Mother testified that she does not want the child to see Grandmother because in January 1992 the child would not leave her sight, and when she would ask the child why he was so frightened he would say because of something he heard at one of Grandmother's meetings. Up until that time she had allowed the child to visit because Grandmother would ask, and she had no reason for concern. She stated she began to research her opinions and things started "clicking." When the

child was born, apparently Grandmother had done a "reading" on the child and told the parents that they had to follow it because this is what the child was to become. Furthermore, she stated that Grandmother had crystals throughout her house, and that some people would use them to attain power. She testified that up until the child was 3 years old she always had to beg Grandmother to take him and watch him, but then in January 1992 she began to specifically ask for the child to come and stay with her. She stated the child was frightened in January 1992 and Mother felt that Grandmother was trying to instill her beliefs into the child. Mother was also concerned because when the child was 3 or 4 Grandmother gave him a tape called "The Rainbow Man," which Mother characterized as a "New Age" tape. Mother listened to it and was shocked. The child said he was told to listen to the tape and think of nothing but what was said on the tape and that he recalled only bridges from it. In December 1992 the child returned from an overnight visit with Grandmother and was upset and acting out.

Under 23 Pa.C.S. §5312, when the parents of a child are separated or divorced, the court may, upon application, grant reasonable partial custody or visitation rights or both to a grandparent. The paramount concern for the best interests of the child remains. There are cases where visitation with grandparents was found to not be in the child's best interests, notwithstanding love for the child and a desire to retain a relationship, where such visitation exacerbated mother's mental health problems to the extent she was unable to care for the child. *Norris v. Tearney, supra.* Mother has strong concerns regarding her child's well-being if Grandmother was allowed to have unsupervised custody of the child. How-

ever, there is nothing in the record to convince this court that, although Mother's concerns may seem quite real *to her,* unsupervised contact with the child should not be allowed. If there was evidence that Mother would be unable to parent the child because of the contact allowed with Grandmother, or that the parent-child relationship would be damaged (see 23 Pa.C.S. §5312), or if there was sufficient evidence to show that there were in fact detrimental activities occurring at Grandmother's home, the court might feel otherwise. However, there is no such evidence in the record.

The court has concerns regarding granting partial custody rights to a third party in any custody dispute. There are only so many ways a child's time can be carved, and the more parties introduced into the action, the more complex and stressful a child's life can become. However, it was the testimony of the expert witness that the child's contact with Grandmother could only benefit him. The child and Grandmother have enjoyed a long and healthy relationship. Multigenerational contacts are too often impossible. Since the record indicates that Grandmother has contact with the child during some of Father's periods of partial custody, there is no need to grant her more than two days per year for exclusive contact with the child, neither of those periods to occur for an overnight period. This is de minimis contact in the extreme. This court's order attempted to take into account not only the best interests of the child in that a continuing relationship with Grandmother would be to his benefit but also to assuage Mother's concerns regarding the child's well-being while in Grandmother's sole presence. It is for these reasons that the court entered its order of October 19, 1995.