**R. Duane DOUGLAS and Carol L. Douglas, His Wife, Appellees,**

v.

**Dale WRIGHT, Appellant.**

Superior Court of Pennsylvania.

Submitted April 15, 2002.

Filed June 11, 2002.

2. The disposition of the remaining crimes on the plea colloquy list is unclear.

H. Bruce Curry, Bridgewater, for appellant.

Gregory K. Douglass, Beaver, for appellees.

Before: LALLY–GREEN, TODD and HESTER, JJ.

HESTER, J.

¶ 1 Dale Wright ("Father") appeals the December 12, 2001 order granting partial custody of his three children to their maternal grandparents, R. Duane Douglas and Carol Douglas (together "Maternal Grandparents," and each "Maternal Grandfather" or "Maternal Grandmother"). We affirm.

¶ 2 A factual and procedural history follows. On February 13, 2001, Kathleen S. Douglas ("Mother"), ex-wife of Father and mother to their three children, Robert Duane Wright (age 17), Daniel Douglas Wright (age 13), and Christopher Brian Wright (age 9), was killed in an automobile accident. Mother and Father were divorced at the time of Mother's death. Prior to Mother's death, Mother had primary physical custody of the three children, who spent considerable time with Maternal Grandparents, who lived nearby. Since Mother's death, Father has had custody of the children. However, Father has not allowed visits or telephone contact between Maternal Grandparents and the children since May 24, 2001, due to discord between Father and Maternal Grandparents.

¶ 3 Maternal Grandparents filed a petition for partial custody, and, on August 7, 2001, the court entered a proposed order granting them partial custody for every third weekend of each month and for four hours on each Sunday that they did not have weekend custody. On August 20, 2001, Maternal Grandparents filed exceptions to the proposed order. On August 27, 2001, the court entered an order staying the proposed order of August 7, 2001, pending a custody trial. Such trial was held on November 28, 2001. On December 12, 2001, the court issued its order and memorandum opinion including specific findings of fact. The order in its entirety is as follows:

I. *CUSTODY:*

A. Physical custody of the minor children, Robert Duane Wright, Daniel Douglas Wright and Christopher Brian Wright is awarded to the father, Dale Wright, with partial custody rights vested in the maternal grandparents, R. Duane Douglas and Carol L. Douglas according to the following schedule and conditions.

B. Legal custody of the above mentioned minors is awarded to the father, Dale Wright. Legal custody means the right to make major decisions regarding the best interest of the minor children, including medical, educational and religious decisions.

II. *PARTIAL CUSTODY:*

A. Weekend and or Weekend Days:

1. The maternal grandparents are granted partial custody rights with the minor children every other weekend during the minor children's school year from 5:00 p.m. prevailing time on Friday to 2:00 p.m. prevailing time on Sunday. Transportation of the minors to and from the custodial residence shall be the responsibility of the father.

2. On the Sundays during which the maternal grandparents do not have weekend partial custody rights, they are granted partial custody rights from 4:30 p.m. to 8:30 p.m. prevailing time.

3. The partial custody rights set forth in paragraph 1 above shall commence the first weekend following the date of this order.

[B]. *Holidays:*

1. The maternal grandparents are granted partial custody rights with the minor children on the following holidays from 8:00 a.m. prevailing time to 8:00 p.m. prevailing time.

a. On New Year's Day, Memorial Day and Thanksgiving Day, beginning in 2002 and all even-numbered years thereafter; and

b. On Easter Sunday, the Fourth of July and Labor Day, beginning in 2003 and all odd-numbered years thereafter; and,

c. The father shall have partial custody rights with the minor children on the exact opposite basis.

2. The parties shall share the Christmas Holiday according to the following schedule and conditions: In 2001 and all odd-numbered years thereafter, the maternal grandparents shall have partial custody rights with the minor children from 10:00 a.m. prevailing time on December 24th to 1:00 p.m. prevailing time on December 25th. Beginning in 2002 and all even-numbered years thereafter, the maternal grandparents are granted partial custody rights with the minor children from 1:00 p.m. prevailing time on December 25th to 4:00 p.m. prevailing time on December 26th. The father shall have partial custody rights with the minor children on the exact opposite basis.

3. The maternal grandparents are granted partial custody rights with the minor children on Mother's Day Weekend each year from 10:00 a.m. prevailing time on Sunday to 8:00 p.m. prevailing time on Sunday.

4. The father is granted partial custody rights with the minor children on Father's Day weekend each year from 10:00 a.m. prevailing time on Sunday to 8:00 p.m. prevailing time on Sunday.

5. Transportation of the minor children to and from custodial residence during these holiday partial custody rights shall be the responsibility of father.

ALL HOLIDAY PARTIAL CUSTODY VISITATION RIGHTS SHALL SUPERSEDE ANY OTHER PARTIAL CUSTODY RIGHTS HEREIN GRANTED.

C. *Summer and/or School Vacation:*

1. Beginning in 2002 and every year thereafter, the maternal grandparents are granted partial custody rights with the minor children during the minor children's summer recess from school during the first two (2) weeks of the months of June, July and August.

2. The father is granted partial custody rights with the minor children during the minor children's summer recess from school during the balance of the months of June, July and August.

3. CONFLICTS IN VACATION SCHEDULING MUST BE RESOLVED BY THE ADULT PARTIES OF THIS CASE IN THE BEST INTEREST OF THE MINOR CHILDREN.

D. *Children's birthdays:*

1. The maternal grandparents are granted partial custody rights with all three minor children on the birthday of each child from 6:00 p.m. to 8:30 p.m.

E. *Employment:*

1. In the event that the minor, Robert Duane Wright, is offered employment by the maternal grandparents to work on their farm, and he accepts such offer, he shall be compensated in a fair and reasonable amount, and, shall be entitled to pursue such employment for no more than two (2) hours each evening after school, and, no more than eight (8) hours per day, five (5) days per week during summer recess from school.

III. *SPECIAL INSTRUCTIONS AND CONDITIONS:*

A. Both parties shall conduct themselves in such a manner so as to not

violate the Bill of Rights of either of the minor children.

    B.   The attached Appendix to Order is made a part hereof by reference thereto, and **must** be complied with to the letter to avoid imposition of sanctions.

    C.   The court retains jurisdiction over all matters involving custody of these minor children.

Order, 12/12/01.

¶ 4 Father presents two issues on appeal:

  I.  DID THE COURT ABUSE ITS DISCRETION IN AWARDING EXCESS CUSTODY TO THE GRANDPARENTS GREATER THAN THAT WHICH WAS AWARDED TO THE FATHER AT THE TIME OF HIS DIVORCE AND IN NOT CONSIDERING WHETHER THE VISITATION WOULD INTERFERE WITH THE PARENT/CHILD RELATIONSHIP?

  II.  DID THE COURT ABUSE ITS DISCRETION BY MAKING FINDINGS OF FACT AND RECOMMENDATIONS IN THE ORDER WHICH AWARD ELEMENTS OF LEGAL CUSTODY TO THE GRANDPARENTS CONTRARY TO THE STATUTE?

Appellant's brief at 3.

¶ 5 Our review of this case is guided by the following:

In reviewing a custody order, we are not bound by findings of fact made by the trial court which are unsupported in the record, nor are we bound by the court's inferences drawn from the facts. However, on issues of credibility and weight of the evidence, we defer to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. Only where we find that the custody order is "manifestly unreasonable as shown by the evidence of record..." will an appellate court interfere with the trial court's determination.

*Norris v. Tearney,* 422 Pa.Super. 246, 619 A.2d 339, 340 (1993) (citations omitted). *See also Graham v. Graham,* 794 A.2d 912, 914–915 ("[A]n appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and, thus, represent a gross abuse of discretion.").

¶ 6 The trial court relied on 23 Pa.C.S. § 5311 in entering its December 12, 2001 order granting partial custody to Maternal Grandparents. Section 5311 states:

If a parent of an unmarried child is deceased, the parents or grandparents of the deceased parent may be granted reasonable partial custody or visitation rights, or both, to the unmarried child by the court upon a finding that partial custody or visitation rights, or both, would be in the best interest of the child and would not interfere with the parent-child relationship. The court shall consider the amount of personal contact between the parents or grandparents of the deceased parent and the child prior to the application.

23 Pa.C.S. § 5311.[1] The burden is on grandparents seeking rights under section

---

**1.**  We recognize the relatively recent decision of the United States Supreme Court in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and find it readily distinguishable. In *Troxel,* the Supreme Court found the application of a Washington state

5311 to demonstrate that partial custody or visitation in their favor is in the child's best interest and will not interfere with the parent-child relationship. *Norris*, 619 A.2d at 340; *Commonwealth ex rel. Miller v. Miller*, 329 Pa.Super. 248, 478 A.2d 451 (1984). We note that, although the parties use the terms "partial custody" and "visitation" interchangeably, the December 12, 2001 order clearly grants partial custody rights to Maternal Grandparents. "Partial custody" is the "right to take possession of a child away from the custodial parent for a certain period of time." 23 Pa.C.S. § 5302. "Visitation" is the "right to visit a child" and "does not include the right to remove a child from the custodial parent's control." *Id.* In this case, Maternal Grandparents clearly have the right to take possession of the children from Father for certain periods of time as outlined in the December 12, 2001 custody order. The difference between custody and visitation is significant since it impacts Maternal Grandparents' burden of persuasion:

> In a dispute between a parent and a third party, including a relative such as a grandparent, the parent has a *prima facie* right to custody which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to a third party.... As the amount of time requested moves the visit further from a visit and closer to custody, the reasons offered in support of the request must become correspondingly more convincing.

*Johnson v. Diesinger*, 404 Pa.Super. 41, 589 A.2d 1160, 1164 (1991) (quoting *Commonwealth ex rel. Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180 (1983)).

■ ¶ 7 In any event, the *paramount* concern in both custody and visitation cases, including those in which grandparents are seeking rights, is the best interests of the child. *Norris, supra,* 619 A.2d at 340. "[T]he goal in each case is to foster those relationships which will be meaningful for the child, while protecting the child from situations which would have a harmful effect." *Miller, supra,* 478 A.2d at 453 (Pa.Super.1984) (quoting, 500 Pa. at 260, 455 A.2d at 1182). Factors to consider in determining the best interests of the child include the child's "physical, intellectual, emotional and spiritual well-being." *Johnson, supra,* 589 A.2d at 1164. Section 5311 requires that the trial court perform a detailed, child-centered analysis when crafting its order granting partial custody to grandparents. *Id.*

■ ¶ 8 We conclude initially that the trial court did properly conduct a detailed analysis focusing on the children's best interests when granting partial physical custody to Maternal Grandparents, and the custody order does not interfere with Father's legal custody. We have carefully and thoroughly reviewed the record including the entire transcript of the custody trial held on November 28, 2001, and we conclude that the trial court's findings of fact as contained in its December 12, 2001 Memorandum Opinion and Order are sup-

---

statute permitting "any person" to petition for visitation impermissibly broad and found that, under the facts of that case, it unconstitutionally infringed on the fundamental right of the parent to make decisions concerning her child. However, the *Troxel* Court cited *with approval* statutes comparable to 23 Pa. C.S. § 5311, which do not contain the broad, sweeping language like that in the Washington statute. Moreover, the *Troxel* Court de-

termined the trial court erred by placing the burden on the *parent* to disprove that the best interests of the child would be served by granting visitation with grandparents. Here, we emphasize it is the grandparents' burden to demonstrate partial custody or visitation is in the best interests of the children and will not interfere with the parent-child relationship.

ported fully by the record. The inferences and conclusions of the trial court, as drawn from its findings of fact and forming the basis of the December 12, 2001 custody order, are reasonable and will not be disturbed by this Court.

¶ 9 Specifically, the record reveals a long-term, close-knit relationship between the children and Maternal Grandparents. Mother and Father were divorced in 1994 after ten years of marriage. N.T. Custody Trial, 11/28/01, at 123. Father remarried in 1998 and has two young children by this marriage. *Id.* After the divorce, Mother and Father agreed, without court intervention, that the children would live with Mother, and Father would have time with the children every other weekend and a weekend or week in the summer. *Id.* at 124. Mother and Father also agreed to split holidays. *Id.*

¶ 10 Mother and the children lived near Maternal Grandparents, who spent considerable time with the children. For example, while Mother worked full-time in the day and attended nursing school in the evenings, from 1991 through the time she graduated in 1994, Maternal Grandparents performed many parental duties such as supervising the children on and off the school bus, driving the children to their activities, preparing meals for them, and helping them with homework. *Id.* at 18. The children had their own bedrooms at Maternal Grandparents' house and frequently stayed overnight. *Id.* at 20, 24. Since Mother continued to work after graduating from nursing school, Maternal Grandparents continued to care for the children as described above. *Id.* at 21. While at Maternal Grandparents' house, the children would often play with their cousins who also lived close to Maternal Grandparents. *Id.* at 27.

¶ 11 Maternal Grandparents live on a farm. Maternal Grandmother works part-time three days a week as a nurse, and Maternal Grandfather is a farmer. The children loved to play and help take care of the animals on the farm. *Id.* at 50, 75. The oldest child took an active interest in the farm from an early age, and Maternal Grandfather taught him the economics of farming, how to care for the animals, and how to operate and maintain farm machinery. *Id.* at 76–77. Maternal Grandfather also taught the two younger children about farming. *Id.* at 78. Maternal Grandfather testified, "I was more their father than I was their grandfather." *Id.* at 92. Maternal Grandparents not only babysat the children when Mother was working or at school, but the children would go over to Maternal Grandparents' house just to spend time together. *Id.* at 93. Maternal Grandfather testified the oldest child "was practically there all the time" in the summer. *Id.* at 93.

¶ 12 Father testified that Maternal Grandfather assaulted him on two occasions. Specifically, after the funeral, Father requested a meeting with Maternal Grandparents and went to their house. *Id.* at 131. After Father told them the children would be living with him, Father testified that Maternal Grandparents told him the children should decide where they want to live. *Id.* Father said they were not old enough to make such a decision. *Id.* Father testified that Maternal Grandfather told him to leave the house and pushed him "roughly three times in the back going down the hall, telling [Father] to get out." *Id.* at 131. Father testified Maternal Grandfather pushed him again once they got outside and said to Father, "If you thought you had problems with [the oldest child] before, you just wait now." *Id.* When Father got in his truck, Grandfather grabbed him by the throat and the arm and said, "I have just lost my daughter. I am not losing my grandkids.

I will see you in Court." *Id.* at 131–32. Maternal Grandmother called Father a few days later to apologize and she and Father agreed that the children could visit Maternal Grandparents every other weekend. *Id.* at 132. Father testified the children spent more time with Maternal Grandparents before Mother's death than he realized, and agreed to let them visit every other weekend since it would be in their "best interests," but that after a "couple visits," the children returned to Father's home in "terrible shape." *Id.* at 133. He testified they would go to their rooms and ignore their two younger half-siblings and their stepmother. *Id.* at 133.

¶ 13 Father also testified about an incident on May 24, 2001, when he went to pick up the oldest child at Maternal Grandparents' house. *Id.* at 136. The oldest child refused to go home with Father. *Id.* at 136. Maternal Grandfather came out of the house and threw a baseball bat at Father's van. *Id.* Father returned with a policeman who suggested that the oldest child stay the night at Maternal Grandparents' house. *Id.* at 137.

¶ 14 After the May 24, 2001 incident, Father did not allow the children to visit or have telephone contact with Maternal Grandparents or any other relatives on Mother's side of the family. *Id.* at 45–46, 48. Maternal Grandparents could see the children at their baseball games and Maternal Grandmother was able to contact the children on one occasion with her cellular telephone. *Id.* at 46–49. At one of the games, she asked Father if he would consider allowing the children to visit again, and he said, "I will think about it." *Id.* at 47.

¶ 15 Overall, Maternal Grandparents' testimony indicates they did not interfere with Father's authority and never encouraged the children to disobey their Father. Maternal Grandfather denied having any physical altercation with Father. *Id.* at 87. We also note that each child testified *in camera* at trial. Although their testimony is sealed, we reviewed their testimony and find that it supports the trial court's findings and order.

¶ 16 We are reminded that it is the function of the trial court to judge the credibility of the witnesses at trial. Obviously, the trial court found Maternal Grandparents' testimony credible. Based on our review of the trial transcript, Maternal Grandparents clearly demonstrated to the court that the children's best interests would be well-served by granting them partial custody. The December 12, 2001 custody order is not excessive in light of the close, loving relationship these children have with Maternal Grandparents. Therefore, we will not disturb the trial court's order.

¶ 17 Father also argues the court's order interferes with his right to sole legal custody, specifically, his right to make decisions concerning religion. Appellant's brief at 14. We disagree. Although Father attends a Lutheran church and Maternal Grandparents attend a Methodist church, the record indicates Mother and children were active members of Maternal Grandparents' Methodist church. N.T. Custody Trial, 11/28/01, at 53. For example, the oldest child is a member of Maternal Grandparents' Methodist church and all the children attended Sunday school, youth groups, and summer camp at that church. *Id.* at 52–53, 84. Mother was a Sunday school teacher and the Sunday school secretary at Maternal Grandparents' church. *Id.* at 82.

¶ 18 The record also supports the trial court's finding that the Methodist religion has the same fundamental theology as the

Lutheran religion.[2] The pastor at Maternal Grandparents' church testified that the Lutheran and Methodist religions are theologically similar. *Id.* at 109. Lutherans attend Methodist seminaries. *Id.* at 110. The religions share Sunday school materials. *Id.* at 111. Each religion recognizes the other's baptisms, memberships, and ordinations. *Id.* at 112. The way each religion celebrates the Christian year and practice sacraments is similar. *Id.* at 113. For example, Methodists can receive sacraments at a Lutheran church and vice-versa. *Id.* at 113. The religions may be merged in the future. *Id.* at 112. Based on the evidence of record, we are not convinced the partial custody order interferes with father's right to legal custody.

¶ 19 Thus, in accordance with our standard of review, we cannot conclude the December 12, 2001 order granting partial custody to Maternal Grandparents is manifestly unreasonable. We defer to the findings of the trial judge, the Honorable George E. James, who had the opportunity to observe the proceedings and make determinations concerning the credibility and demeanor of the witnesses, including all three children who each spoke to Judge James separately in camera. As evidenced in his Memorandum Opinion and Order of December 12, 2001, Judge James performed a careful and detailed analysis of the children's best interests, and the evidence presented at trial supports the trial court's determination that the children's best interests is served by allowing them to maintain the close relationship developed with Maternal Grandparents prior to Mother's death. Further, we cannot conclude the grant of partial custody to Maternal Grandparents is so excessive as to interfere with the parent-child relationship. Accordingly, we affirm the December 12, 2001 order granting partial custody to Maternal Grandparents.

¶ 20 Order affirmed.

---

2. Curiously, Father indicates throughout his brief that Maternal Grandparents are Baptist, but the record clearly indicates that Maternal Grandparents are Methodist.