**Seidel v. Feltenberger**

C.P. of Berks County, no. 96-11251.

*Bernard Mendelsohn,* for plaintiff and defendant Seidel.

*Kathleen D. Dautrich,* for defendant and additional defendant Feltenberger.

*Robert T. Ullman,* for plaintiff Venkler.

*David S. Sobotka,* for defendant and additional defendant Venkler.

SCHMEHL, P., *J.,* June 30, 1998—This matter is before the court on exceptions to the report and recommended order of the child custody hearing officer.

## PROCEDURAL HISTORY

On September 20, 1995, the maternal grandmother, Ann Seidel, Grandmother, filed a complaint for custody

for the minor child, Jessica. On December 1, 1995, the court entered an order by agreement granting primary physical custody of Jessica to Grandmother, subject to the rights of partial custody of Mother and Father. The order provided that the parties could relist the matter for an additional conference within one year by contacting the child custody conference officer. On October 21, 1996, Norman Venkler, Father, filed a petition for modification of the custody order, and Grandmother answered. On February 3, 1998, Jessica's paternal grandmother filed a complaint for partial custody. The child custody hearing officer filed her report on March 11, 1998, and on March 18, 1998, Shari Feltenberger, Mother, and Father each filed exceptions. On June 8, 1998, after the child's parents and grandparents all agreed and stipulated that the paternal grandmother would receive four hours of visitation with Jessica every other week and after Grandmother's withdrawal of her continued claim for custody, the matter proceeded to a hearing on the issue of custody as between the parents.

## FACTUAL BACKGROUND

Mother and Father began cohabiting a few months before Jessica's birth on March 25, 1992, but never married. Mother had been employed up to the point of Jessica's birth but then stayed home to care for the child. Father was employed full-time and also helped to run his father's bar, particularly after his father's death.

Mother and Father had an abusive relationship. Father often verbally abused Mother, and may well still do so in their limited contact. Although he denies it, in the view of the court, he physically abused Mother as well over an extensive period of time. Finally, in

June of 1995, Mother left with Jessica to live with her mother (Grandmother) and stepfather.

Prior to leaving Father, Mother was the primary caregiver for Jessica while Father worked to support them financially. Although Mother was employed at various times during their relationship, she and Father had always decided that Mother should stay home to care for Jessica. Furthermore, there were nights when Father would not come home from the bar but would stay there overnight, leaving Mother alone to care for Jessica. Apparently, Father was not significantly involved in the immediate day-to-day care of Jessica.

Upon moving in with her parents, Mother received their help in caring for Jessica. In December of 1995, Mother and Father agreed to give primary physical custody to Grandmother so that Jessica could be put on Grandmother's insurance through her employment. The order by agreement also granted partial custody to Mother and Father. This order stood in effect until the present time, despite the fact that Grandmother was never able to put Jessica on her insurance.

Despite the December 1995 order, Father was able to obtain visitation with Jessica above and beyond that provided in the order simply by calling Mother and Grandmother. Around the time of Father's filing his petition for modification, however, the situation changed, and Father asserts he no longer received extra time. He also allegedly had difficulty seeing Jessica even on his regularly scheduled time pursuant to the order. Mother and her parents testified that their lack of co-operation with giving Father more time had nothing to do with his petition, but rather was the result of Father's constantly causing "trouble" after dropping off Jessica as well as Father's wife's calling Grandmother names during a contemporaneous telephone call. In any

case, there were more arguments and fights between the parties after Father's petition was filed. Furthermore, at or about the same time, paternal grandmother was no longer able to see Jessica on her own.[1] Grandmother testified that she ceased taking Jessica to see the paternal grandmother because of an alleged "nasty" phone call which she received from the paternal grandmother and not because of Father's petition for modification.

While Jessica has been in Grandmother's custody, several fairly important and major decisions regarding Jessica's life were made without consultation with Father. Mother and Grandmother, together or individually, made arrangements for Jessica to be involved in soccer, to attend day care and kindergarten, to be baptized, and for a Florida trip over her birthday, among other things. Grandmother and Mother communicated very little, if at all, with Father. At the hearing, Mother testified that she could not talk with Father, particularly in person, because she feared renewed abuse and because she felt that she was not capable of communicating with him because of his argumentative nature. She stated the times that she tried to talk with him resulted in "nasty" arguments, and had the communication been in person, she believed she would have been physically abused. Grandmother testified that no one could discuss things with Father—they could "talk at, but not to [Father]."

---

1. At some time subsequent to the December 1, 1995 order, the parties agreed that paternal grandmother would have visitation with Jessica every other week. Paternal grandmother does not drive and, typically, Grandmother or her husband would take Jessica to see the paternal grandmother. Furthermore, they claim to have accommodated paternal grandmother's changing her nights of visitation and would have allowed her to continue to see Jessica but no longer desired to provide the transportation.

At the time that Father filed his petition for modification, Mother was residing on her own and without Jessica, who had remained with Grandmother. After the petition was filed, Mother moved back in with Grandmother. The reason given for Mother's living on her own, without Jessica, was that she was not capable of supporting both of them at that time. She testified that she moved back in with Grandmother on the advice of counsel. In any case, the court finds that Grandmother has exercised significant control over Jessica and her affairs and may well have accomplished this by also controlling Mother's life to the extent possible. Mother's parents apparently do not think highly of her ability to survive on her own, despite having the income to do so.

The work schedules of Mother, second shift, and Grandmother, first shift, have allowed Mother to care for Jessica during the day and Grandmother to care for her in the evening. There was a period, however, where Jessica was placed in a day care to expose her to other children of her age. Mother and Grandmother were allegedly prompted to remove Jessica from the day care; however, because Jessica experienced problems, particularly with one boy, Justin, the son of Father's wife. Justin's behavior has since improved.

Mother testified that if she were granted custody of Jessica, she would maintain second shift during the summer months but move to first shift during the school year to spend time with Jessica. Father and his wife both work first shift and would necessarily require the use of a baby sitter or day care before and after school except for days when Father would be home early for weather-related reasons.

For the foreseeable future, Mother intends to continue living with Grandmother. Although Mother and Grand-

mother have concerns about Father's ability to care for Jessica and properly discipline her, both Grandmother's and Father's households are capable of caring for Jessica in a family atmosphere. In Grandmother's household, Jessica would be living with Mother, Grandmother and Grandmother's husband. At Father's household, she would be living with Father, his wife and his wife's son. Both households provide Jessica with her own bedroom; however, at Grandmother's house, Jessica very often sleeps with Grandmother in her bed and, occasionally, with Mother. At Father's house, Jessica sleeps in her own bed.

## DISCUSSION

When Jessica was very young, Mother and Father apparently believed that it would be better for her to reside with Grandmother. Mother and Father retained partial custody and assumed at least some of their parental responsibilities; nevertheless, it appears that Grandmother has been a significant caretaker of Jessica. Nothing in this opinion is to imply that Grandmother has not provided adequate care for Jessica; however, Grandmother is no longer a party in this action. The dispute is between Mother and Father, but her continuing role is significant to this case.

The paramount concern in a child custody proceeding is what is in the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). "[A] determination of what is in the best interests of the child . . . [is] made on a case-by-case basis [and] must be premised upon consideration of 'all factors which legitimately have an effect upon [a] child's physical, intellectual, moral and spiritual well-being.' " *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

The removal of a young child from an established home with one parent is a factor which should be considered in resolving a custody issue because it bears upon a child's emotional well-being. *Commonwealth ex rel. Jordan v. Jordan,* 302 Pa. Super. 421, 425, 448 A.2d 1113, 1115 (1982). Where both parents are fit and the child is of tender years, the court must give positive consideration to the parent who has been the primary caretaker. *Id.* This consideration is given to recognize the benefits that are likely to flow to the child from maintaining day-to-day contact with the parent on whom the child has depended for basic physical and psychological needs. *Id.* Furthermore, the role of the primary caretaker is a substantial factor which must be weighed in adjudicating a custody matter where the child is of tender years. *Id.* at 426, 448 A.2d at 1115.

The court believes that transfer of primary custody to Father and removal from the home she knows will be detrimental to the child's emotional well-being. Jessica is obviously close to Grandmother as well as Grandmother's husband. Jessica also apparently has a greater bond to Mother than to Father. The court believes both parents are fit but does recognize that if Jessica remains with Mother, she will continue to receive the same day-to-day contact with the person on whom she has primarily depended for her basic needs. For this reason, Mother's residing with Grandmother weighs as a substantial factor.

As between Mother and Father, Mother has been the primary caregiver, whereas during his periods of visitation, Father has allegedly relied heavily on the help of his wife. Mother has been a good parent. When Jessica was younger, Mother changed her diapers, fed her, and played with her. Mother still feeds and plays with Jessica, but now she also helps her dress in the

morning and makes sure she bathes. She has Jessica in an established routine which is healthy for her. In addition to this, Mother has available to her the surrounding support of her parents.

The character and habits of individuals with whom a child has daily, in-home contact bear upon whether proximity to these persons is in the child's best interests. *Andrews v. Andrews,* 411 Pa. Super. 286, 298, 601 A.2d 352, 357 (1991), *affirmed,* 533 Pa. 354, 625 A.2d 613 (1993). "It is in the child's interest to preserve and nurture those relationships which are meaningful while avoiding situations which might prove harmful." *Bucci v. Bucci,* 351 Pa. Super. 457, 460, 506 A.2d 438, 439 (1986).

Jessica has a strong bond with Grandmother and apparently does not wish to break that bond. Jessica, in the view of the court, is better bonded with Mother than with Father. She is doing well in Grandmother's household. This is not to say that she does not have a good relationship with Father and the members of his household and, in fact, has a good bond with Father's wife. Mother and Grandmother have expressed concern, however, with Jessica living in the same household as Justin who has had behavioral problems and been troublesome to Jessica in the past. The court does not give great weight to this argument because Justin's behavior has improved and there have been no reported incidents between Justin and Jessica since they were in the same day care together.

There are other issues to consider. Both Mother and Father, in the past, apparently abused alcohol. Although the primary concern in custody matters lies not with the past but with the present and future, past conduct is relevant to the extent that it will produce an ongoing negative effect on the child's welfare. *Commonwealth*

*ex rel. Gorto v. Gorto,* 298 Pa. Super. 509, 514, 444 A.2d 1299, 1301 (1982). The past alcohol abuse may give some indication of what the future holds. Mother has been through counseling, including intensive outpatient counseling at Caron, and has reportedly been attending AA meetings. She still occasionally drinks when she goes out with co-workers after work. Father also occasionally drinks but he has not attended counseling or AA except for an ARD program in 1991. He and his wife both testified that he does not have a problem with alcohol. The potential for either party to once again abuse alcohol continues.

Although Jessica has strong bonds with the individuals in Grandmother's household, she has not had the opportunity to develop a very strong bond with Father and the members of his household. She and Father deserve some additional opportunity to do so. Mother even acknowledged that Father and daughter deserved time together because Jessica is the child of both. The difficulty for Mother in making arrangements work with Father has been putting behind her, the past, long, and difficult time of abuse. The court cannot ignore this tortuous history of physical and verbal abuse, of which the child is undoubtedly aware, and understands Mother's difficulty. Still, Jessica must be given the opportunity to spend more time with Father without upsetting the status quo so significantly as to unduly shock her and disrupt her way of life, including her established relationships, routines, and discipline.

Although the court is not obligated to delegate to expert witnesses the responsibility of making a decision in a custody matter, the court is obligated to consider the testimony of experts. *Rinehimer v. Rinehimer,* 336 Pa. Super. 446, 453, 485 A.2d 1166, 1169 (1984). It was the recommendation of Deidre Young MCAT, the

court-appointed custody evaluator, that Father's custody of Jessica be increased. She suggested a shared custody arrangement where each parent would have custody for approximately one-half of every week. She believed that the close proximity of the residences would allow a shared custody arrangement to work and that it would be convenient and beneficial.

The court is not bound to accept the testimony of an expert witness but it cannot disregard uncontradicted expert testimony. *Murphey v. Hatala,* 350 Pa. Super. 433, 447, 504 A.2d 917, 924 (1986), *appeal denied,* 516 Pa. 634, 533 A.2d 93 (1987). Ms. Young believed that the advantages of granting custody to Mother include stability, consistency in caregivers, and Mother's commitment to sobriety. The disadvantages include Mother's second shift job (perhaps a non-issue in futuro), her lack of interest and commitment to providing ongoing care to Jessica, her passivity, and her negative attitude. Furthermore, Grandmother is too controlling and is of no assistance in helping Mother become independent.

The advantages of Father obtaining custody, according to Ms. Young, include his willingness to assume more parental responsibilities and the value that he places on spending time with his family. Also, his wife has above-adequate parenting skills, and Jessica is positively attached to her. In addition, Jessica expressed to Ms. Young a desire to spend more time with Father. The disadvantages of Father obtaining custody include breaking Jessica's bond with Grandmother, Father's alcohol use and denial of knowledge obtained in treatment, and his procrastination and reluctance to complete his responsibilities without delegating them to others.

The criteria for determining the propriety of shared custody are that both parents must be fit, both must

evidence continuing desire for active involvement in the child's life, both must be recognized by the child as sources of security and love, and, significantly, at least a minimal degree of cooperation between the parents is a must. *Andrews,* 411 Pa. Super. at 291, 601 A.2d at 354. Both parents are fit. They are capable of making rational child-rearing decisions, and they are both able and willing to provide love and care for Jessica. Mother and Father each also desire to be actively involved in Jessica's life. Mother testified that she was willing to rearrange her work schedule to spend time with Jessica during the appropriate hours of the summer and the school year. Father wants more involvement and has been upset by his exclusion from decision-making regarding Jessica and from being able to see her more frequently. Also, both parents are apparently recognized by Jessica as sources of security and love. Jessica, however, fears that Father is a threat to Mother's safety,[2] and may well have been affected psychologically by her awareness of Father's abusive conduct.

The real concern for a shared custody arrangement is the lack of communication and lack of cooperation between Mother and Father. They do not have a good relationship, and although Mother testified that she cannot communicate with Father, she indicated that she was willing to at least attempt to communicate with Father, through the use of an intermediary if necessary.

---

2. Mother's allegations about Father's prior abusive conduct towards her are relevant in custody proceedings "only insofar as they constitute a threat to the child or affect the child's welfare." See *Nancy E.M. v. Kenneth D.M.,* 316 Pa. Super. 351, 356, 462 A.2d 1386, 1388 (1983). Other than the possibility that Jessica may have been exposed to fighting between Mother and Father, to include witnessing the physical assault of Mother by Father, there is and has been no threat to Jessica's safety.

She says that in an effort to be able to attempt communication with Father, she has been going through counseling to help her overcome her fear of him, thereby making such communication possible.[3]

The stated preference of a child should be afforded the appropriate weight in a custody proceeding. *Mahoney v. Mahoney,* 354 Pa. Super. 585, 591, 512 A.2d 694, 697 (1986). The particular weight to be given to a child's preference is to be determined to a great extent upon the age, maturity, and intelligence of the child. *Id.* The child has expressed her preference and appears well-nourished and reasonably well-adjusted. Overall, she is doing well in the current environment.

The court must consider, under 23 Pa.C.S. §5303(a), which parent would be the parent to be more or less likely to encourage a continuing relationship with the other parent.

The court was dismayed at Mother's apparent unwillingness to include Father in the decision-making process in the life of this child. Nonetheless, she has explained to the satisfaction of the court her past unwillingness to be more cooperative and sharing.

It is the sincere hope of the court that Mother will now fully inform Father of what is going on in the life of this child to assure his participation in significant events in her life and decisions regarding vacation, schooling, etc. Should the court conclude in the future that she continues to cut Father out of the child-rearing process, it here takes the extraordinary step of advising the parents that this decision will be revisited immediately on simple application to the court.

---

3. Mother's testimony with reference to the long and pervasive abuse and dominance of her by Father was persuasive.

Given the pros and cons discussed above, the court believes that a more balanced custody arrangement would be in the best interests of Jessica and enters the following order:

## ORDER

And now, June 30, 1998, it is hereby ordered and decreed that the parties shall have joint legal custody and share physical custody of their minor child, Jessica, as follows:

(1) Father shall have custody of the child as follows:

(a) Alternate weekends, as well as every fifth full weekend of the month for months with five full weekends, from 4 p.m. or the close of school on Thursday to Sunday at 7 p.m.;

(b) Every Wednesday if acceptable to Father, otherwise Tuesday, from 4 p.m. or the close of school to 8 p.m.; and

(c) At such other times as the parties may mutually agree and, in lieu of such agreement, at such times as the court, upon application, may direct.

(2) Mother shall have custody at all other times except for the four hours of visitation granted to the child's paternal grandmother on alternating weeks by agreement of the parties. Visitation shall be on alternating Mondays from 4 p.m. or the close of school to 8 p.m. if Mother and paternal grandmother are unable to agree otherwise.

(3) Mother shall have custody of the minor child on Mother's Day and Father shall have custody of the minor child on Father's Day each year from 10 a.m. to 6 p.m.

(4) The parties shall alternate custody on the following named holidays as follows: In the even numbered years

Father shall have custody from 10 a.m. to 8 p.m. on New Year's Day, Memorial Day, and Labor Day and Mother shall have custody from 10 a.m. to 8 p.m. on Easter, Independence Day, and Thanksgiving. The holidays shall reverse in the odd numbered years.

(5) The parties shall alternate the following time periods regarding Christmas: On odd numbered years, Mother shall have custody of the child from December 24 at 2 p.m. to December 25 at 2 p.m., then Father shall have custody of the child on December 25 at 2 p.m. to December 26 at 8 p.m., with the parties to reverse schedules on even numbered years.

(6) The parties shall equally split the child's Christmas and spring vacations from school.

(7) Mother shall have custody of the child for two consecutive weeks of vacation each summer as the parties may agree or upon advance written notice of at least 30 days to the other party. Father shall have two consecutive weeks of vacation without interruption and four other nonconsecutive weeks each summer as the parties may agree or upon advance written notice of at least 30 days to the other party. If a conflict over vacation arises, the party giving notice in writing first shall have preference. Neither party shall take trips outside the Commonwealth with the child without first discussing with, and obtaining approval from, the other party, which approval shall not unreasonably be withheld.

(8) The holiday and vacation schedules shall take precedence over the regular custody schedule.

(9) In addition to any provisions which may be contained herein regarding custody and visitation, Father and Mother shall have the following rights with respect to the child: reasonable telephone calling privileges, access to report cards and other relevant information

concerning the progress of the child at school, approval of extraordinary medical and/or dental treatment except in the case of any emergency, provided such approval shall not be unreasonably withheld, approval of summer camp, schools, school and extracurricular activities, churches and church-related activities, provided that such approval shall not be unreasonably withheld. No major decisions will be made unilaterally by either parent, and tentative arrangements regarding the above and similar activities shall be discussed with the other parent within 24 hours of receipt of information.

(10) In the event of any serious illness of the child at any time, any party then having custody of the said child shall, within one hour, communicate with the other party by telephone or any other means, informing the other party of the nature of the illness. During such illness, each party shall have the right to visit the child as often as she or he desires consistent with the proper medical care of said child. The word "illness," as used herein, shall mean any disability which confines or likely will confine the child to bed under the direction of a licensed physician for a period in excess of 48 hours.

(11) Communication between the parties may be through an intermediary. Within 24 hours of this order, the parties shall find a friend or family member with whom each party can work to serve as an intermediary between them. The parties should also find an alternate intermediary in the event the primary intermediary is unavailable when needed. In the event the parties fail to agree on an intermediary or their chosen intermediary is unavailable, the parties shall turn to their attorneys as intermediaries.

(12) Within five days of this order, each party shall make arrangements with T.A.S.C., or other acceptable

drug and alcohol evaluating entity, for an evaluation. Each party shall also sign the necessary releases for the reports and recommendations to be sent to the court for its review.

(13) Each party shall immediately notify the other party before changing residence and provide the other party with her/his new address.

(14) Neither party will insult, disparage or downgrade the other party in the presence or hearing of the child, nor shall they unduly influence the child against the other party.

(15) Certain rules of conduct generally applicable to custody matters are set forth in paragraphs (a) through (h), below, and are binding on all parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for amendment of the custody order. If these general rules conflict with the specific requirements of the custody order, the order shall prevail.

(a) No party will undertake nor permit in his or her presence the poisoning of the minor child's mind against any other party by conversation which explicitly or inferentially derides, ridicules, condemns, or in any manner derogates any other party.

(b) The parties shall not conduct arguments or heated conversations when they are together in the presence or hearing of their child.

(c) No party will question the child as to the personal lives of the other party except as is necessary to insure the personal safety of the child. In other words, the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of a "spy."

(d) No party will make extravagant promises to the minor child for the purposes of ingratiating himself

or herself to the minor child at the expense of the other party. Any reasonable promise to the child should be made with the full expectation of carrying it out.

(e) The parties should at all times consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying desperately to cope with the fact of his or her parents' separation, and needs help in loving both parties, rather than interference or censure.

(f) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the party who maintains a double standard will lose the respect of his or her child.

(g) Periods of custody shall be subject to the following rules:

(1) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(2) The party having custody of the child should prepare her both physically and mentally for the visitation with the other party and have her available at the time and place upon which the parties agree.

(3) If either party or the child has plans which conflict with a scheduled visit and wish to adjust such visitation, the parties should make arrangements acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(4) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

538

(h) During the time that the child is living with a party, that party has the responsibility of imposing and enforcing the rules for day-to-day living. However, unless otherwise ordered, both parents should consult with one another on the major decisions affecting the child's life, such as education, religious training, medical treatment, and so forth.

(16) In the event that either parent violates the terms of this order and excludes the other parent from the child-rearing process, the injured party may request the court to revisit the matter on simple application.