## Orlando v. Orlando

C.P. of Berks County, no. 97-6873.

*Terry R. Fetterman,* for plaintiff.
*David G. Campbell,* for defendant.

SCHMEHL, P.W., *J.,* November 9, 1998—This matter is before the court on Ms. Orlando's exceptions to the report and recommendation of the child custody hearing officer. Ms. Orlando, Mother, and Mr. Orlando, Father, are the parents of two minor children, David, age 8, and Aidra, age 6. Mother and Father separated on or about June 6, 1997 when Father was excluded from the marital residence by a protection from abuse order obtained by Mother. Mother had physical custody of the children until approximately August 9, 1997 when she attempted to commit suicide.[1] Since that time, Father has had primary physical custody of the children.[2] For the reasons set forth herein, primary physical custody of the parties' children shall remain with Father.

The paramount concern in a child custody proceeding is what is in the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of the child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040,1042 (1995). The removal of a young child from an established home with one parent is a factor which should be considered in resolving a custody issue because it bears upon a child's emotional well-being. *Commonwealth ex rel. Jordan v.*

---

1. Allegedly, this was not Mother's only attempt at suicide.

2. Primary physical custody of the children was confirmed in Father by a temporary custody order entered by agreement on September 2, 1997, and another on September 9, 1998.

*Jordan,* 302 Pa. Super. 421, 425, 448 A.2d 1113, 1115 (1982).

The character and habits of individuals with whom a child has daily in-home contact bear upon whether proximity to these persons is in the child's best interests. *Andrews v. Andrews,* 411 Pa. Super. 286, 298, 601 A.2d 352, 357 (1991), *affirmed,* 533 Pa. 354, 625 A.2d 613 (1993). It is in the child's interests to avoid situations which might prove harmful, whether physically, mentally or emotionally. See *Bucci v. Bucci,* 351 Pa. Super. 457, 460, 506 A.2d 438, 439 (1986). Although the primary concern in custody matters lies not with the past but with the present and future, past conduct is relevant to the extent that it will produce an ongoing negative effect on the child's welfare. *Commonwealth ex rel. Gorto v. Gorto,* 298 Pa. Super. 509, 514, 444 A.2d 1299, 1301 (1982).

In addition to applying the foregoing law to the facts of a case, the court is obligated to consider the testimony of expert witnesses. *Rinehimer v. Rinehimer,* 336 Pa. Super. 446, 453, 485 A.2d 1166, 1169 (1984). Furthermore, although the court is not bound to accept the testimony of an expert witness, it cannot disregard uncontradicted expert testimony. *Murphey v. Hatala,* 350 Pa. Super. 433, 447, 504 A.2d 917, 924 (1986), *appeal denied,* 516 Pa. 634, 533 A.2d 93 (1987).

This has been one of the more venom-saturated custody hearings this court has heard, but, if there was one underlying consistency, it was Mother's inability to accept any responsibility for the situation and her readily consistent ability to blame others for the entire situation.

It is, in fact, alarmingly consistent with the remarks made by Peter Thomas Ph.D. about her paranoia. This and other psychiatric conditions were alluded to by Dr. Thomas, both based upon his own evaluation and based upon his comprehensive review of notes received from the family doctor and psychiatrist who had been working with Mother.

Mother would have the court believe that there is a massive conspiracy of police departments out to get her. She would have the court believe that everyone in Father's family is seeking her destruction as a parent by almost any means possible. Mother spent a fair amount of time on the stand answering questions with questions of her own, even after admonition by the court not to do so. When the issue addressed in questioning was painful to her, or, in her view, the answer would have been embarrassing or incriminating, she dodged by saying that it was not the business of the questioner. In short, there is nothing that dissuades the court from Dr. Thomas' comprehensive and well-reasoned conclusion that Father should have principal custody of these children. This is not to say that Father does not have some deficits. Clearly he does. But in terms of the best interests and welfare of the children, they pale in comparison to the markedly serious and potentially child-damaging deficits which Mother has.

There was an *extensive* list of drugs which Mother has been on, some presently.[3] Mother was addicted to and

3. The list of drugs includes Percocet, Imitrex, Xanex, Phenergen, Demerol, Trazadone, Benadryl, Haldol, Toradol, Depakote, Luvox, Vistearil and Serzone. She also told Dr. Thomas that in 1995 she used cocaine.

abused some of these drugs, and to the knowledge of the court, she may still be abusing drugs since there was no testimony from her or from anyone else that she is now drug-free or substantially so.[4] The testimony of her current therapist, Susan Freeman, who holds a master's in counseling psychology from Kutztown University, suggested that her role was more that of a confidante than as someone either able or willing to deal with the deep-seated and, in the view of Dr. Thomas, incurable psychiatric and personality deficits extant in Mother. His view is that there are some parts of her personality which are ingrained in her, so to speak, based upon some rather damaging things which happened to her as a child and young adult. The best that can be hoped for, in Dr. Thomas' view, is that she can learn to cope with these personality issues with appropriate therapy and perhaps medicines. Dr. Thomas believes that Mother can certainly deal, to some extent, with her problems, with therapy, but he, of course, would have had to carefully review what was being done, by whom, and for what period of time and, specifically, what areas of her deficit were being addressed before he would be willing to pass on the success of any such modality.

Mother's life seems to be one of mild chaos. The house is barely taken care of. Police officers who have been at the house report that it is unkempt at best. There may or may not be appropriate heat therein. Mother admitted she does not have running hot water, and either goes to

---

4. Dr. Thomas' view was that Mother ought to be on one or more medicines to control her psychiatric problems, so it is not likely, therefore, that she would ever be drug-free.

the neighbor to bathe or heats water on the stove to get hot water. As described above, the chaos in Mother's life goes beyond her living conditions. She has attempted twice to take her life. It would have been nice to hear from her that she carefully and precisely limits her intake of prescription drugs and, then, only under the careful and vigorous scrutiny of a medical doctor. She argues that she uses prescription injections to control migraine headaches. The court is aware of these injections, and indeed, they seem an appropriate way to deal with these most miserable of headaches, but there was not a clue given as to what other drugs she may still be on, for what conditions, and in what amounts. Her doctor could have offered incredibly relevant testimony as to how he or she is monitoring (or not monitoring) her drug ingestion. Nothing was offered. In short, in her view, at least insofar as the almost total absence of testimony in this area would suggest, there is no drug issue.

Dr. Thomas, on questioning by the court, indicated that he was not overly concerned about the safety of these children in the custody of their mother for certain periods of time, but he would certainly be more comfortable knowing that she was in a regular and appropriate counseling situation to monitor how she was dealing with her various problems.

Father presents as a passive individual who, nonetheless, the court believes, to be a caring and nurturing father who intends to grow in his capacities to appropriately rear his children. He has attempted to stabilize the lives of his children in the face of some of the aforementioned chaos and has, in the view of the court, succeeded

reasonably well. The children are doing very well in school.

Because this court removed him from the marital home, Father has had to find housing where he could—first, with his mother and father and, currently, with his sister. The circumstances of their housing are not ideal but are certainly better than adequate. Father has the support of his parents and other family members to assist him with his parenting responsibilities. He has effectively used that assistance and, nonetheless, does not unreasonably delegate his responsibilities.

As suggested by the court at the beginning of these remarks, no one seems to get along with anyone involved in this situation. Mother, of course, believes that everyone is out to prevent her from being a mother to these children. Father's parents have nothing positive at all to say about their daughter-in-law in these proceedings. Father, while acknowledging the first few years of the marriage to be reasonably happy and productive, has currently nothing good to say about his estranged wife. They all seem to live in a fairytale world—a world where they do not comprehend the damage that their vitriol spreads upon the psyche of these children.

The over-arching, threatening penumbra of this situation is Mother's multiple problems. There was not a clue as to whether or not she has followed the advice of health care professionals in dealing with her psychiatric issues, clinical depression issues, and misuse of prescription drug issues in any cohesive or coordinated and consistent fashion. She did nothing in court to dissuade this writer that she was indeed paranoid. The court attaches no stigma

to psychiatric or psychological concerns—certainly in the lives of most human beings there are times when they ought to seek such professional counseling. There was no hint in her testimony, however, either that she had any of these problems or that she was addressing them in an appropriate fashion as delineated above—that is, a cohesive, coordinated and consistent fashion.

The court cannot operate in a vacuum with regard to the decision affecting the lives of two young people. It was Mother's positive obligation and responsibility to make her own case for her mental health and for her effective and constant control of her drug usage and for other issues which Dr. Thomas pointed out as essential for her to deal with.

It must be mentioned that Dr. Thomas enjoys a reputation as one of the finest custody evaluators operating in Berks County and, in the view of this court, he would hold such high standing in any jurisdiction. He takes his work very seriously. He is very thorough and if he is not prepared to take a strong position, he advises the court and supports his uncertainty with the work and research that he has done. In this case, the choice is clear to him. He strongly believes that the children should be with Father and he asserts, even with vigorous cross-examination, that there is little to suggest that, even with intensive therapy for Mother, his opinion would change. There is never a case where there isn't some hope, but the court believes it is Dr. Thomas' impression that if Mother would have acknowledged all of these deficits and addressed them appropriately, his position may have mellowed. With only the therapy she is receiving with

Ms. Freeman, she has fallen far short of what is necessary to satisfy this court that the current situation ought to change. Ms. Freeman, in addition, has seen none of the other players in this situation and can comment only upon the reasonably regular attendance Mother has had with her.

In the opinion of the court, it is in the best interests of the children for Father to maintain primary physical custody. The physical environment of Father's residence is cleaner, safer, and overall more suitable for children than Mother's. Also, the intellectual and emotional environment is more stable at Father's home. Father has the children in an established routine, whereas Mother's schedule is erratic and inconsistent. Given these circumstances and Mother's inclination to allow her emotions to overwhelm her and her inability to remain level-headed, the court cannot find that it is in the best interests of the children for them to spend more time with Mother.

For the above reasons, the court enters the following order:

## ORDER

And now, November 9, 1998, it is hereby ordered and decreed that custody of the parties' minor children, Aidra and David, shall be as follows:

(1) The parties shall have joint legal custody of the children.

(2) Father shall have primary physical custody of the children.

(3) Mother shall have partial physical custody of the children as follows:

(a) On Tuesdays and Wednesdays, Mother shall pick the children up at school upon the conclusion of the school day and shall transfer custody back to Father at 8 p.m. at the McDonald's on Route 422 in Sinking Spring. On non-school days, Mother shall pick up the children at 3:30 p.m. at the location of the children's caregiver and shall transfer custody back to Father at 8 p.m. In keeping with the protection from abuse orders entered on September 9, 1998 to no. 97-4091, there shall be no unnecessary verbal exchanges between the parties during the custody transfer at McDonald's. Paternal grandfather shall not meddle in any fashion except to the extent *required* by his law enforcement duties.

(b) On alternating Fridays, Mother shall pick up the children at school upon the conclusion of the school day, and she shall have custody until she returns them to school on the following Monday morning. On non-school days, Mother shall pick up the children at 3:30 p.m. from the caregiver, and she shall have custody until she returns them the following Monday morning at 8 a.m. to the person(s) designated to care for the children on non-school days.

(c) Given the time of the year and the question of whether Mother has adequate heat and hot water, the children shall not remain in Mother's custody overnight. On the weekends when Mother has custody, the children shall be transferred into the custody of Father each night at 8 p.m. at the McDonald's on Route 422 in Sinking Spring, and Mother shall pick up the children at the same location the next morning, with the exception of Mon-

day morning, at 8 a.m. Mother may resume uninterrupted weekend custody when she demonstrates to the court that she has adequate and safe heat and hot water in her home.

(4) Mother shall have custody of the minor children on Mother's Day and Father shall have custody of the minor children on Father's Day each year from 9 a.m. to 8 p.m.

(5) The parties shall alternate the following named holidays as follows: in the even numbered years, Father shall have custody from 9 a.m. to 8 p.m. on New Year's Day, Memorial Day and Labor Day, and Mother shall have custody from 9 a.m. to 8 p.m. on Easter, Independence Day and Thanksgiving. The holidays shall reverse in the odd numbered years.

(6) The parties shall alternate the following time periods regarding Christmas: on odd numbered years, Mother shall have custody of the children from December 24 at 9 a.m. to December 25 at 12 p.m., then Father shall have custody of the children on December 25 at 12 p.m. to December 26 at 8 p.m., with the parties to reverse schedules on even numbered years.

(7) Each party shall have custody of the children for two non-consecutive weeks of vacation in each calendar year upon advance written notice of at least 30 days to the other party. If a conflict over vacation arises, the party giving notice first shall have preference.

(8) The holiday and vacation schedules shall take precedence over the regular custody and partial custody schedule.

(9) In addition to any provisions which may be contained herein regarding custody and visitation, Father and

Mother shall have the following rights with respect to the children: reasonable telephone calling privileges, access to report cards and other relevant information concerning the progress of the children at school, approval of extraordinary medical and/or dental treatment except in the case of any emergency provided such approval shall not be unreasonably withheld, approval of summer camp and schools provided that such approval shall not be unreasonably withheld.

(10) In the event of any serious illness of the child(ren) at any time, any party then having custody of the said child(ren) shall immediately communicate with the other party by telephone or any other means, informing the other party of the nature of the illness. During such illness, each party shall have the right to visit the child(ren) as often as she or he desires consistent with the proper medical care of said child(ren). The word "illness," as used herein, shall mean any disability which confines the child(ren) to bed under the direction of a licensed physician for a period in excess of 48 hours.

(11) Each party shall immediately notify the other party before changing residence and provide the other party with her/his new address.

(12) Neither party will insult, disparage or downgrade the other party in the presence or hearing of the children, nor shall they unduly influence the children against the other party.

(13) Certain rules of conduct generally applicable to custody matters are set forth in paragraphs (a) through (h), below, and are binding on all parties, the breach of

which could become the subject of contempt proceedings before this court, or could constitute grounds for amendment of the custody order. If these general rules conflict with the specific requirements of the custody order, the order shall prevail.

(a) No party will undertake nor permit in his or her presence the poisoning of the minor children's minds against any other party by conversation which explicitly or inferentially derides, ridicules, condemns, or in any manner derogates any other party.

(b) The parties shall not conduct arguments or heated conversations when they are together in the presence or hearing of their children.

(c) No party will question the children as to the personal lives of the other party except as is necessary to insure the personal safety of the children. In other words, the child(ren) will not be used as a spy on the other party. It is harmful to a child to be put in the role of a "spy."

(d) No party will make extravagant promises to the minor children for the purposes of ingratiating himself or herself to the minor child at the expense of the other party. Any reasonable promise to the children should be made with the full expectation of carrying it out.

(e) The parties should at all times consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying desperately to cope with the fact of his or her parents' separation, and needs help in loving both parties, rather than interference or censure.

(f) The parties should remember that they cannot teach their children proper moral conduct by indulging in im-

proper conduct themselves. Children are quick to recognize hypocrisy, and the party who maintains a double standard will lose the respect of his or her child.

(g) Periods of custody shall be subject to the following rules:

(1) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child(ren) to unnecessary apprehension and failure of expectations.

(2) The party having custody of the child(ren) should prepare them both physically and mentally for the visitation with the other party and have them available at the time and place upon which the parties agree.

(3) If either party or the child(ren) has plans which conflict with a scheduled visit and wish to adjust such visitation, the parties should make arrangements acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child(ren).

(4) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(h) During the time that the child(ren) is living with a party, that party has the responsibility of imposing and enforcing the rules for day-to-day living. However, unless otherwise ordered, both parents should consult with one another on the major decisions affecting the child's life, such as education, religious training, medical treatment, and so forth.